In re the Marriage of Marguerite I. NARDINI, petitioner, Appellant,

v.

Ralph E. NARDINI, Respondent.

No. C1–85–1421.

Supreme Court of Minnesota.

Oct. 23, 1987.

Cort C. Holten, Karl L. Cambronne, Minneapolis, for appellant.

Robert J. Tansey, Jr., E. Anne McKinsey, Minneapolis, for respondent.

## OPINION

COYNE, Justice.

Marguerite Nardini has obtained further review of a decision of the court of appeals affirming the trial court's valuation of a business owned by the parties to this marital dissolution proceeding, its characterization of one-half the value as nonmarital property belonging to Ralph Nardini, and its award to Marguerite of temporary spousal maintenance in the amount of $1,200 per month for a 5–year period. *Nardini v. Nardini*, 385 N.W.2d 339 (Minn.App.1986). We affirm in part, reverse in part, and remand for further proceedings in conformity with this opinion.

Marguerite, presently 56 years of age, and Ralph, now 58 years of age, were married in 1953, with dissolution after 31 years of marriage by judgment and decree entered on June 28, 1985. The marriage produced two children, both of whom are adults who have established their own homes.

Critical to the appropriate distribution of property owned at the time of the dissolu-

tion of the parties' marriage are the valuation of the primary business of the parties and its characterization as marital or nonmarital. The record discloses that both prior to and during the marriage, Ralph was engaged in the sale and maintenance of fire protection equipment. He claims that in 1949, prior to his marriage, he purchased a 50% interest in the whole of Chemical Sales & Service, a sole proprietorship, from Peter Dietsch for $2,500 and that he continued in the employ of the business for several years servicing equipment. Marguerite disputes the fact that Ralph's purchase was as extensive as he claimed, contending instead that he bought an interest only in that portion of the business which was engaged in servicing fire extinguishers. Despite this dispute, the record is devoid of any evidence offered by either party of the value of the business, its sales or assets at the time of either the claimed purchase or the marriage.

At the time of the marriage in 1953 Ralph was a uniformed service employee who worked for a salary. Periodically, Marguerite assisted in keeping the books of the business. In 1956, the Nardinis purchased Dietsch's remaining interest for $12,500 and incorporated the business. Several years later the name of the corporation was changed to Nardini Fire Equipment Company of Minnesota (Nardini of Minnesota). During the ensuing years, the parties incorporated Nardini Fire Equipment Company of North Dakota, and finally formed Nardini Development Company to purchase the land in Shoreview and construct the building that Nardini of Minnesota has leased since 1973. While Ralph manages the business and continues to call on customers, the business now has 12 full-time employees and engages 3 independent contractors. At the time of dissolution of the marriage, Ralph held 60% of the shares of Nardini of Minnesota, and Marguerite held the other 40% of the shares.

While the parties were able to stipulate that Nardini of North Dakota had a net value at dissolution of $25,000 and Nardini Development a net value of $165,924, they were unable to agree on either the value of Nardini of Minnesota or its character as marital or nonmarital property. Moreover, while Ralph attributes the great financial success of the businesses to his "key man" effort alone, Marguerite asserts that she too contributed greatly by her years of periodic employment with the company, her extensive civic and social involvements, and her provision of a traditional marital home during the years of growth. We therefore scrutinize the record for evidence on these claims and disputes.

To determine the value of Nardini of Minnesota, Marguerite's expert, Steven Thorp, employed a comparison analysis, examining specific characteristics and financial information of similar companies. In comparing the Nardini business to publicly-traded companies and taking into account factors unique to the Nardini operation, he valued Nardini of Minnesota at $725,213.

John Hawthorne, Ralph's expert witness, estimated value by both a comparison analysis and an examination of similarly structured small fire equipment dealers operating in the metropolitan area. He, too, noted and factored the unique Nardini characteristics, but he estimated the total value of Nardini of Minnesota at $350,000. He then assumed that one-half the value was excepted nonmarital property and reduced the remaining one-half value to reflect a lack of operational control in a one-half interest. He ultimately opined that a one-half interest had a value of $135,135. Separately, Hawthorne estimated liquidation value of the corporation at $391,456. While he acknowledged that this valuation exceeded the sale valuation, he reasoned that the risks and expenses attendant on liquidation must be considered in estimating the market value of the company as a going business.

The record clearly demonstrates Ralph's contributions to the growth of the business. Working within the company since 1949 and functioning as its president and salesperson, Ralph has developed the business contacts and personally claims responsibility for 50% to 60% of the sales based upon his personal relationships with customers and his hard work. Marguerite's contributions were less tangible, taking the form of sporadic bookkeeping services and

substantial community involvement, including active volunteer work and service on the Little Canada City Council. Moreover, as indicated, she provided a stable home and family life which permitted Ralph to devote his efforts to business achievements.

The trial court found that Ralph owned a one-half interest in the common stock of Nardini of Minnesota as nonmarital property and assigned a market value of $135,135 to that one-half interest. The trial court found that the other one-half interest in the common stock of Nardini of Minnesota was marital property, which the court also valued at $135,135. The trial court divided the marital property as follows:

| Marguerite | | | Ralph | | |
|---|---|---|---|---|---|
| Homestead | | | Pratt carriage home | | |
| Market | 197,500 | | Market | 75,000 | |
| Less: | | | Less: | | |
| 1st mortgage | 17,663 | | Mortgage | 75,000 | 0 |
| 2nd mortgage | 5,200 | 174,637 | | | |
| Lot 38, Woodbury, Double Bungalow | | | Lot 37, Woodbury, Double Bungalow | | |
| Market | 39,500 | | Market | 39,500 | |
| Less: | | | Less: | | |
| Mortgage | 39,500 | 0 | Mortgage | 39,500 | 0 |
| Two vacant lots | | | | | |
| Market | 79,682 | | | | |
| Less: | | | | | |
| 1st mortgage | 35,682 | | | | |
| 2nd mortgage | 14,000 | 30,000 | | | |
| Limited partnership one-half interest | 14,338 | | | | |
| IRA account | 2,200 | | IRA account | | 2,200 |
| Personal property | 25,850 | | Personal property | | 5,000 |
| Kidde Company, 162 shares | 5,285 | | | | |
| Nardini of Minn. Pension plan, present value ½ interest | 55,859 | | Nardini of Minn. Pension plan, present ½ interest | | 55,859 |
| | | 308,169 | | | |
| | | | Nardini of Minn. ½ interest | | 135,135 |
| | | | Nardini of North Dakota | | 25,000 |
| | | | Nardini Development | | 165,924 |
| | | | Cash value of life insurance | | 17,028 |
| | | | North Oaks Country Club, 1 share | | 3,000 |
| | | | | | 409,146 |
| Cash due from Ralph | | 50,489 | Less: Cash due to Marguerite | | 50,489 |
| | | 358,658 | | | 358,657 |

In addition, of course, the court awarded the parties their nonmarital property: Marguerite's nonmarital jewelry valued at $5,200, and Ralph's nonmarital interest in Nardini of Minnesota valued at $135,135.

The trial court went on to find that Ralph has been employed by Nardini of Minnesota for the last 36 years and that as president of the company and a key man, Ralph earns approximately $90,000 per year in salary and bonus together with pension benefits and the use of a leased automobile. The court also found that although Marguerite has been essentially unemployed throughout almost 32 years of marriage and suffers from psoriasis, she is an able-bodied woman capable of employment and training for employment and awarded spousal maintenance of $1,200 per month for not more than five years.

Finally, the trial court denied Marguerite's request for fees of attorneys, accountants, and appraisers incurred in connection with the proceeding.

On appeal the court of appeals affirmed, commenting that sometime before expiration of her award of temporary maintenance, Marguerite may renew her request for permanent maintenance. *See* Minn. Stat. § 518.64, subd. 1 (1986).

## I.

A. *Valuation of the Family Business.*

Minn.Stat. § 518.58 (1986) provides that when a marriage is dissolved, "the court shall make a just and equitable division of the marital property of the parties." Notwithstanding the common law's somewhat cynical reference to the length of the chancellor's foot,[1] equity denotes fairness and requires the application of the dictates of conscience or the principles of natural justice to the settlement of controversies. Hence, the statutory mandate requiring the courts to consider all relevant factors in making the division:

> The court shall base its findings on all relevant factors including the length of the marriage, any prior marriage of a party, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, needs, opportunity for future acquisition of capital assets, and income of each party. The court shall also consider

the contribution of each in the acquisition, preservation, depreciation or appreciation in the amount or value of the marital property, as well as the contribution of a spouse as a homemaker. It shall be conclusively presumed that each spouse made a substantial contribution to the acquisition of income and property while they were living together as husband and wife.

Minn.Stat. § 518.58 (1986). On reviewing this record, we are reminded that the art of advocacy, which prevailed when the trial court adopted verbatim Ralph's proposed findings and conclusions, is not nearly as well-suited to the resolution of family disputes as is the art of compromise.

When the parties cannot agree on a division of the marital property, just and equitable division of an asset included in the marital property of the parties can be accomplished in one of three ways: (1) If the asset is readily divisible, the court can divide the asset and order just and equitable distribution in kind; (2) the court can order the sale or liquidation of the asset and make a just and equitable division of the proceeds of sale or liquidation; or (3) the court can determine the value of the asset, order distribution of the entire asset to one of the parties, and order the recipient to pay to the other spouse a just and equitable share of the value of the asset. Whatever the method, the goal is to place *both* parties in the optimum position. The choice of methods usually depends on the type of asset to be divided. While the first method may be an eminently suitable way to divide the shares of a publicly owned corporation, it is an unlikely choice if the corporation is closely held. The second method has the advantage of certainty and may be necessary for equitable division when an indivisible asset constitutes the bulk of the marital property. Sale or liquidation of a family-owned business may be appropriate if, for example, the parties are at or near retirement age or the dissolution of the marriage may adversely affect the business. The third method, which is in essence a forced sale by one spouse to the

---

1. J. Selden, *Table Talk* 37 (3d ed. London 1716)    (1st ed. London 1689).

other in which the court sets the selling price and the terms of payment, has the greatest potential for error and unfairness, particularly where the asset is the major marital asset. It is the third method of division which gives rise to this appeal.

The principal bone of contention here, as well as in the earlier stages of these proceedings, is the value and disposition of the parties' principal asset: the family business. The book value of Nardini of Minnesota at December 31, 1984 was $565,598. The corporation held cash and cash equivalents totalling more than $100,000 and its net accounts receivable exceeded $300,000. Absent an unnoted change in accounting methods, inventory was carried at the lower of cost (first in—first out method) or market. Current liabilities, including current installments of long term debt, were less than $80,000. The consultants' estimates of the market value of Nardini of Minnesota varied from $725,000 to $350,-000. The one consultant also testified that the value of a one-half interest in the common stock of the corporation must be reduced from $175,000 to $135,135 to reflect a lack of control. While we are cognizant of the difficulty and the imprecision of valuing a closely held corporation, nevertheless it is apparent that a valuation which assumes that either Marguerite or Ralph would be willing participants in a sale of Nardini of Minnesota to a third party for a price of $270,270—a sum no greater than the corporation's cash and cash equivalent, Ralph's annual salary and benefits and one year's net corporate income—is unrealistic.

■ First, for purposes of valuing marital property, there is no justification for discounting an undivided interest in a corporation all of whose shares are owned by one or both spouses. Although shares may be transferred from one spouse to the other, whenever the court is called on to value a business, neither any corporate asset nor any fraction of the shares of the corporation will actually be sold to an outsider. Generally, as occurred here, the corporate shares are awarded to the spouse more

actively engaged in the business of the corporation, and the management and operation of the business continue essentially unchanged. In this context the establishment of a fair market value contemplates nothing more than the assignment of a fair and reasonable value to the family business as a whole to allow equitable apportionment of the marital property.

Second, Ralph's appraiser testified that the amount which could be realized by liquidating the corporation significantly exceeded its market value as a going business. Nevertheless, the trial court adopted the lesser value, which it further discounted for lack of control. The value of a family business as marital property cannot be less than a sum equal to the net proceeds which could be realized from the forced sale of the tangible assets of the business and the collection or assignment of intangibles such as accounts receivable, and after payment of all liabilities. If the corporation is to continue in operation under the management of one of the owner-spouses even though the liquidation value of the business is greater than its value as a going business, assigning the corporation the lesser value as a going business patently disadvantages the spouse who must relinquish his or her interest in the corporation and unfairly benefits the spouse to whom the marital interest in the corporation is awarded. Moreover, inasmuch as Nardini of Minnesota is a thriving and vital corporation with cash and cash assets in excess of liabilities, the worst-case scenario suggested by "down and dirty" liquidation is not a suitable measure of market value.[2] While the relinquishment of his or her interest in the family business is in effect a forced sale, the court must determine the value of the business as if the transaction were a sale of the entire business by a willing seller to a willing buyer.

■ There is, of course, no universal formula for determining the value of a closely held business. No matter how experienced and objective the appraiser, the valuation of a business is an art, influenced

---

**2.** Ralph's appraiser considered $407,859 a "realistic" liquidated value for Nardini of Minnesota. His "down and dirty" liquidation figure was $391,456.

by various subtle and subjective factors. While book value may be an appropriate starting point in valuing a business such as Nardini of Minnesota, with its high liquidity and modest investment in machinery and equipment, whatever the starting point, other factors, such as the following, must be taken into consideration before a reasonable valuation can be made:

1. The nature of the business and the history of the enterprise from its inception.

2. The economic outlook in general and the condition and outlook of the specific industry in particular.

3. The book value of the stock and the financial condition of the business.

4. The earning capacity of the company.

5. The dividend-paying capacity.

6. Whether or not the enterprise has goodwill or other intangible value.

7. Sales of the stock and the size of the block of the stock to be valued.

8. The market price of stocks of corporations engaged in the same or a similar line of business having their stocks traded in a free and open market.[3]

In any case a sound valuation requires not only the consideration of all relevant facts but also the application of common sense, sound and informed judgment, and reasonableness to the process of "weighing those facts and determining their aggregate significance."[4]

Viewed in the light of the foregoing principles, it is apparent that by failing to take into consideration the relevant facts and the fundamental factors appropriate for use and analysis in the value of a closely held corporation, the trial court abused its discretion. We remand for determination of the fair and reasonable value of Nardini of Minnesota in accordance with the principles enunciated in this opinion.

**3.** Revenue Ruling 59–60, 1959–1 C.B. 237.

**4.** *Id.* at 238. Although Revenue Ruling 59–60 sets out the procedure used by the Internal Revenue Service for estate and gift tax valuation, we regard the eight fundamental factors therein identified as equally appropriate for use

**B.** *Allocation of Marital and Nonmarital Interests.*

The allocation of Nardini of Minnesota between marital and nonmarital interests rather understandably foundered on the shoals of uncharted waters. In proceedings for dissolution of a marriage the court is required to "make a just and equitable division of the marital property of the parties." Minn.Stat. § 518.58 (1986). The statute provides that the court may apportion nonmarital property to prevent unfair hardship. *Id.* Prerequisite, of course, to an equitable division is a determination of the character of property as marital or nonmarital. Both marital and nonmarital property are defined at Minn.Stat. § 518.-54, subd. 5 (1986):

"Marital property" means property, real or personal, including vested pension benefits or rights, acquired by the parties, or either of them, * * *. All property acquired by either spouse subsequent to the marriage and before a decree of legal separation is presumed to be marital property regardless of whether title is held individually or by the spouses in a form of co-ownership * * *. The presumption of marital property is overcome by a showing that the property is nonmarital property.

"Nonmarital property" means property real or personal, acquired by either spouse before, during, or after the existence of their marriage, which

(a) is acquired as a gift, bequest, devise or inheritance made by a third party to one but not to the other spouse;

(b) is acquired before the marriage;

(c) is acquired in exchange for or is the increase in value of property which is described in clauses (a), (b), (d), and (e);

(d) is acquired by a spouse after a decree of legal separation; or

and analysis in determining the value of a closely held corporation as marital property for purposes of equitable distribution. *E.g., Nehorayoff v. Nehorayoff,* 108 Misc.2d 311, 437 N.Y.S.2d 584 (1981).

(e) is excluded by a valid antenuptial contract.

Here the trial court determined that Ralph had acquired a one-half interest in the business now known as Nardini of Minnesota before he and Marguerite were married and declared that one-half of the present value of Nardini of Minnesota is nonmarital property. At first glance the result seems to comport with the statute, which provides in rather straightforward terms that property acquired before the marriage and the increase in value of such property is nonmarital property. The simplicity of the statutory definition is, however, rather deceptive, for the language seems out of harmony with the modern definition of property as a bundle of divisible rights and offers little direction with respect to resolving the complex valuation questions frequently encountered in marriage dissolution cases. The statutory language does not distinguish between increases in value that occur prior to the marriage and increases that occur during the marriage. Neither does it make any distinction based on either the nature or the cause of the increase in value. That is, the statutory language does not distinguish between realized and unrealized gain and does not distinguish between increases due to the efforts of one or both of the spouses and increases from causes unrelated to the efforts of either of them.

In order to resolve the ambiguities which surface on any attempt to determine the value of property and its character as marital or nonmarital, the terms "acquired before marriage" and "increase" in the definition of nonmarital property have generally been interpreted in a manner consonant with the policy underlying the dissolution statutes.

For example, in *Schmitz v. Schmitz,* 309 N.W.2d 748 (Minn.1981), we held that a homestead comprised both marital and nonmarital interests. The husband had provided the down payment on the duplex in which the parties lived and paid the mortgage payments from the rental income from the other unit. The determination was based on the analysis in *Woosnam v. Woosnam,* 587 S.W.2d 262 (Ky.App.1979), recognizing the marital character of appreciation attributable to the joint or team efforts of the spouses with respect to property purchased in part with nonmarital funds. We have summarized the formula in these words:

> The present value of a nonmarital asset used in the acquisition of marital property is the proportion the net equity or contribution at the time of acquisition bore to the value of the property at the time of purchase multiplied by the value of the property at the time of separation. The remainder of equity increase is characterized as marital property and is distributed according to Minn.Stat. § 518.58 (1980).

*Brown v. Brown,* 316 N.W.2d 552, 553 (Minn.1982).

Subsequently, we held that sums expended during the marriage for improvements to a homestead purchased with nonmarital funds were property attributable to the parties' joint efforts and constituted marital property. *Faus v. Faus,* 319 N.W.2d 408, 412 (Minn.1982). The court of appeals has since applied the principles developed in *Schmitz* and *Faus* to apportion marital and nonmarital interests in a homestead purchased in part with nonmarital funds, holding in *Quinlivan v. Quinlivan,* 359 N.W.2d 276 (Minn.App.1984), that just as "sums expended" for improvements to nonmarital property constitute marital property, so too do contributions of labor toward such improvements.

Generally, other states which have, like Minnesota, enacted statutes based on the original draft of section 307 of the Uniform Marriage and Divorce Act (1970)[5], have

---

**5.** The uniform act no longer refers to marital and nonmarital property. As amended in 1973, alternative A of section 307 provides for equitable distribution of *all* of the property of the parties, including their separate estates as well as their joint property, whenever and however acquired. Although alternative A is recommended for adoption, alternative B was included to meet the objections of community property states which prefer to adhere to the distinction between community property and separate

adopted the same rationale we adopted in *Schmitz* for the apportionment of property paid for partly before and partly after the marriage. *Tibbetts v. Tibbetts*, 406 A.2d 70 (Me.1979); *In re Marriage of Herr*, 705 S.W.2d 619, 623–24 (Mo.App.1986); *Wade v. Wade*, 72 N.C.App. 372, 381–82, 325 S.E.2d 260, 269 (1985). *But see Bentley v. Bentley*, 84 Ill.2d 97, 101, 49 Ill.Dec. 295, 297, 417 N.E.2d 1309, 1311 (1981) (all increase in nonmarital property is nonmarital property). At least one jurisdiction interpreting a statute similar to section 518.54, subd. 5 has treated the increase in value of nonmarital shares of a closely held corporation as marital property. *McLeod v. McLeod*, 74 N.C.App. 144, 149–51, 327 S.E.2d 910, 913–15 (1985). There the court distinguished between an increase in value attributable to the efforts of the parties and an increase in value attributable to inflation and general economic and market conditions [6]. Other courts have made the distinction between increase in value attributable to the efforts of the parties and that attributable to external forces despite statutory language which appears to make no such distinction. *E.g., Cockrill v. Cockrill*, 124 Ariz. 50, 52, 601 P.2d 1334, 1336 (1979) (increase in value of separate property due to husband's efforts during marriage held community property); *Van Newkirk v. Van Newkirk*, 212 Neb. 730, 733–34, 325 N.W.2d 832, 834 (1982) (increase in value of separate property because of inflation was nonmarital property); *Kelly v. Kelly*, 86 Nev. 301, 468 P.2d 359 (1970) (increase in value due to efforts of others was separate property); *Roffman v. Roffman*, 124 Misc.2d 636, 476 N.Y.S.2d 713 (1983) (term "increase in value of separate property" not applicable to growth of a business that was the primary economic foundation of a lengthy marriage).

The principle that the increase in the value of a business during the marriage is the product of the contributions of both marital partners and, hence, belongs to the marital partnership is articulated by Justice William R. Geiler in *Wood v. Wood*, 119 Misc.2d 1076, 1079, 465 N.Y.S.2d 475, 477 (Sup.Ct.1983):

> The concept of equitable distribution is a corollary of the principle that marriage is a joint enterprise whose vitality, success and endurance is dependent upon the conjunction of multiple components, only one of which is financial. The nonremunerated efforts of raising children, making a home, performing a myriad of personal services and providing physical and emotional support are, among other noneconomic ingredients of the marital relationship, at least as essential to its nature and maintenance as are the economic factors, and their worth is consequently entitled to substantial recognition. Thus, the extent to which each of the parties contributes to the marriage is not measurable only by the amount of money contributed to it during the period of its endurance but, rather, by the whole complex of financial and nonfinancial components contributed. The function of equitable distribution is to recognize that when a marriage ends, each of the spouses, based on the totality of the contributions made to it, has a stake in and right to a share of the marital assets accumulated while it endured, not because that share is needed, but because those assets represent the capital product of what was essentially a partnership entity.

■ We hold that the increase in the value of nonmarital property attributable to the efforts of one or both spouses during their marriage, like the increase resulting from the application of marital funds, is marital property. Conversely, an increase in the value of nonmarital property attributable to inflation or to market forces or conditions, retains its nonmarital character. The principle may be illustrated by this hypothetical: Let us assume that on the date of their marriage John owned real

property. Unif. Marriage and Divorce Act § 307 comment at 314 (1973).

**6.** The *McLeod* court, as do many commentators, called the increase in value attributable to the efforts of the spouses "active appreciation" and the increase in value attributable to inflation and general economics and market conditions as "passive appreciation." We prefer to adhere as closely as possible to the statutory language.

estate then valued at $30,000 but subject to a $20,000 mortgage. Jane owned 300 shares of XYZ Co. On the date of marriage the market value of the publicly traded, unencumbered shares was $25 per share or $7,500.

Expending marital funds for materials and hired labor but doing most of the work themselves, soon after their marriage John and Jane built an addition to the building on John's property, increasing its value by $10,000—from $30,000 to $40,000. During the course of the marriage, the parties used marital funds to pay the mortgage balance down to $4,000. At the time of the dissolution the market value of the real estate was $100,000.

Inasmuch as the real property comprised both marital and nonmarital interests, the interests should be apportioned according to the formula set out in *Brown v. Brown,* 316 N.W.2d 552, 553 (Minn.1982). Before applying the formula, however, it must be recognized that there are three kinds of "increase" involved in the example: (1) the increase in value attributable to the physical improvement of the property through application of marital funds and marital effort; (2) the increase in value attributable to the increase in equity by application of marital funds to reduce the mortgage indebtedness; and (3) the increase in value attributable to inflation and market forces. The hypothetical assumes an investment of cash and of property and services having a cash value in the total amount of $40,000. Whatever amount John may have invested in the property prior to the marriage, on the date of the marriage his nonmarital equity in the property was $10,000. During the marriage the parties contributed marital funds and labor in the construction of an addition which increased the value of the property by $10,000. In addition, the parties undertook payment of the $20,000 mortgage balance with marital funds, reducing the unpaid balance to $4,000.[7] The present value of John's nonmarital interest

is the proportion his net equity at the time of marriage ($10,000) bore to the aggregate of the value of the property on the date of the marriage ($30,000) plus the value of the addition on its completion ($10,000). The interests will then be apportioned as follows:

1. $10,000 divided by $40,000 = .25
2. $100,000 × .25 = $25,000     (John's nonmarital interest)
3. $100,000 − $25,000 = $75,000 (marital interest).

The net value of the property, however, is only $96,000 ($100,000 − $4,000 mortgage balance). Because the parties undertook payment of the mortgage debt with marital funds, reduction of the marital interests by the amount of the mortgage balance ($75,000 − $4,000 = $71,000) is appropriate. Thus, $71,000 is marital property and $25,000 is John's nonmarital property, all to be justly and equitably distributed pursuant to Minn.Stat. § 518.58 (1986).

At the time of the dissolution, Jane owned 800 shares of XYZ Co., which then had a market value of $40 per share or $32,000. The increase in the number of shares is the result of a 2 for 1 split which increased Jane's holdings from 300 to 600 shares. The additional 200 shares were acquired through the reinvestment of cash dividends paid during the marriage. Jane claims all 800 shares of XYZ Co. as her nonmarital property.

The Commissioner's Note to the original draft of section 307 of the Uniform Marriage and Divorce Act, embodied in section 518.54, subd. 5, states in part:

> The phrase "increase in value" used in subsection (b)(5) is not intended to cover the income from property acquired prior to marriage. Such income is marital property. Similarly, income from other non-marital property acquired after the marriage is marital property.

Unif. Marriage and Divorce Act § 307 comment at 204 (1970). The intent of the draft-

---

7. A $16,000 reduction of the principal balance of the mortgage would, of course, involve an expenditure of marital funds considerably in excess of $16,000. Debt service or interest on borrowed funds, however, increases neither the value of the property purchased with borrowed money nor the borrower's equity in that property and, hence, does not enter into the apportionment of marital and nonmarital interests.

ers, then, indicates that a stock dividend or split is nonmarital property: a stock dividend or split, the value of which is determined by market forces, does not increase the shareholder's proportionate ownership interest in the corporation and is not usually regarded as income. Cash dividends, on the other hand, would be considered a return on the investment or income and, therefore, be marital property. *E.g., Nelson v. Nelson*, 114 Ariz. 369, 560 P.2d 1276 (Ct.App.1977). Thus, Jane's 300 original shares and the 300 shares received in the stock split, having a total value of $24,000, would be Jane's nonmarital property, and the 200 shares purchased by reinvesting dividends and having a present value of $8,000 would be marital property.

Of course, investments do not always increase in value. If the value of Jane's 800 shares of XYZ Co. were worth only $10 per share at the time of the dissolution, Jane's 600 nonmarital shares would be worth only $6,000, less than the value of the 300 shares Jane owned when she married John. The 200 shares purchased with marital funds would have a present value of only $2,000.[8]

The foregoing examples illustrate the application of the formula developed in *Schmitz, Brown*, and *Faus*. This formula, designed to apportion marital and nonmarital interests in a specific parcel of residential real estate, usually the homestead of the parties, may also be used to apportion interests in certain other kinds of property, such as publicly traded stock, the value of which depends on forces outside the marital partnership. While the general principles underlying the *Schmitz, Brown*, and *Faus* decisions are susceptible of broad application, the mechanical application of the formula is inapposite when the property in question is a business or some complex combination of real and personal property.

Although the parties cast their differences in terms of the extent to which the efforts of each enhanced the value of the business, there is no dispute that the present value of the stock of Nardini of Minnesota is attributable to the efforts of the marital partners over the course of more than 30 years of marriage. Certainly, the business did not prosper of its own accord. Ralph's $2,500 purchased a one-half interest in a business which consisted of a truck, a carbon dioxide tank, various tools and manuals and, according to Ralph, "that's about it." Given the nature of the assets of the business in 1949 and of the corporate assets today,[9] the increase in the value of the business cannot be reasonably attributed to market conditions. There can be little doubt that more than 35 years of essentially prosperous and mildly inflationary economic conditions provided a favorable climate in which a budding business could grow and flower. But a business, like a garden, must be tended if it is to flourish. The economic life of the truck and carbon dioxide tank of 1949 has long since ended; and were it not for the personal efforts contributed by the spouses, the investment would have withered and

---

8. Using the "active/passive appreciation" rationale, New York reaches a similar conclusion with respect to its equitable distribution statute:

> The active/passive management distinction is certainly useful in avoiding the harsh results that would flow from viewing a business that was the economic cornerstone of a long-term marriage as separate property simply because the business, in some form, began to take shape before the marriage. * * * On the other hand, strict reliance upon an active/passive management distinction has its shortcomings as well. For example, assume that one spouse has a valuable interest in government securities at the time of marriage. Assume further that the other spouse is employed and generates such income so as to not require the invasion of the capital and therefore, the securities are periodically "rolled over" with interest being added to the original principal. Under a strict reading * * * those "rollovers" would be property in exchange for separate property. To hold that because the investment was "passive", indirect spousal contributions of the other spouse as wage earner [are to be unreimbursed upon dissolution of the marriage] would seem unfair.

N.Y. Domestic Relations Law § 236 (McKinney 1986), Practice Commentary ¶ C236B:8 at 221.

9. Nardini of Minnesota owns no real estate (a kind of asset which may appreciate by reason of inflation or market forces); its investment in fixtures and equipment is modest; and cash, receivables, and inventory are its principal assets.

died with the truck and the tank. What Ralph really invested in was the opportunity to turn his talents toward the development of an enterprise in which he had a personal stake.

█ The stated capital of the corporation formed after the 1956 acquisition of the Dietsch interest is only $2,000. The corporate financial statements make no reference to paid-in surplus. Whether business assets were transferred to the corporation at a zero basis or retained by the Nardinis and did not become corporate assets is not apparent from the record. By December 31, 1984, the book value of the corporate shares had increased to $565,598. Thus, in addition to the corporate income distributed to Ralph and Marguerite as salary, pension plan contributions and other fringe benefits, on December 31, 1984, the corporation had retained earnings of $563,598 (all of which were, of course, earned during the' marriage). It seems to us that the nature of income generated through the efforts of the marital partners is not changed by its retention as shareholder equity in a wholly owned corporation. Whether the business be carried on as a family corporation or a partnership or a sole proprietorship, income earned during the marriage, whether distributed or undistributed and reinvested in the business, is marital property.

The fundamental error in the trial court's apportionment of marital and nonmarital interests in Nardini of Minnesota lies in the assumption that because Ralph purchased a one-half interest in a business prior to the marriage, his nonmarital interest should forever be one-half of the value of the business. The assumption ignores the fact that the events of the past 31 years have diluted the significance of the original nonmarital interest: Ralph's $2,500 investment in 1949 has been dwarfed by the overall success of the business. Even though we regard the formula developed in *Schmitz, Brown,* and *Faus* unsuitable for apportioning the marital and nonmarital interests in a business which has been in the family over the course of a long term traditional marriage, owns no real estate and has little in the way of physical assets, and whose success has depended on the efforts of the marital partners, the general principle underlying *Schmitz* and its progeny—that the present value of each interest is essentially proportionate to the amounts of the respective investments—suggests an appropriate basis for apportioning the marital and nonmarital interests in Nardini of Minnesota. While Ralph invested $2,500 in the business in 1949, the record here reveals that over the course of more than 31 years the marital partnership reinvested in Nardini of Minnesota $563,598 of retained earnings in addition to the $12,500 paid for Dietsch's interest in the business—money which could have been used for the acquisition of marital assets of a different kind. Nearly the entire present value of Nardini of Minnesota, then, should be apportioned as marital interest, which under the facts of this case the trial court has properly allocated to the parties in equal shares.

## II.

### *Maintenance.*

The trial court awarded Marguerite temporary spousal maintenance in the amount of $1,200 per month for five years. Affirming, the court of appeals stated that Marguerite could renew her request for permanent maintenance sometime prior to the expiration of the temporary award. We agree with Marguerite, however, that on the record before us this limited award of maintenance amounts to an abuse of discretion.

Maintenance, an award of "payments from the future income or earnings of one spouse for the support and maintenance of the other", Minn.Stat. § 518.54, subd. 3 (1986), may be granted when the court finds that the spouse seeking maintenance:

(a) lacks sufficient property, including marital property apportioned to the spouse, to provide for reasonable needs of the spouse considering the standard of living established during the marriage, especially, but not limited to, a period of training or education, or

(b) is unable to provide adequate self-support, after considering the standard of living established during the marriage

and all relevant circumstances, through appropriate employment, or is the custodian of a child whose condition or circumstances make it appropriate that the custodian not be required to seek employment outside the home.

Minn.Stat. § 518.552, subd. 1 (1986).

When it has been determined that it is appropriate to grant maintenance, the amount and duration of the award are to be set as the court deems just after considering all relevant factors, including eight factors specified by the legislature:

(a) the financial resources of the party seeking maintenance, including marital property apportioned to the party, and the party's ability to meet needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party as custodian;

(b) the time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment, and the probability, given the party's age and skills, of completing education or training and becoming fully or partially self-supporting;

(c) the standard of living established during the marriage;

(d) the duration of the marriage and, in the case of a homemaker, the length of absence from employment and the extent to which any education, skills, or experience have become outmoded and earning capacity has become permanently diminished;

(e) the loss of earnings, seniority, retirement benefits, and other employment opportunities forgone by the spouse seeking spousal maintenance;

(f) the age, and the physical and emotional condition of the spouse seeking maintenance;

(g) the ability of the spouse from whom maintenance is sought to meet needs while meeting those of the spouse seeking maintenance; and

(h) the contribution of each party in the acquisition, preservation, depreciation, or appreciation in the amount or value of the marital property, as well as the contribution of a spouse as a homemaker or in furtherance of the other party's employment or business.

Minn.Stat. § 518.552, subd. 2 (1986).

Finally, doubts with respect to duration are to be resolved in favor of permanency:

Nothing in this section shall be construed to favor a temporary award of maintenance over a permanent award, where the factors under subdivision 2 justify a permanent award.

Where there is some uncertainty as to the necessity of a permanent award, the court shall order a permanent award leaving its order open for later modification.

Minn.Stat. § 518.552, subd. 3 (1986).

■ Referring us to Minn.Stat. § 645.21 (1986), Ralph contends that the above-quoted disposition in favor of permanency may not be applied to this maintenance order dated June 28, 1985. It is true that 1985 Minn.Laws ch. 266, § 2, which incorporated into section 518.552 the whole of subdivision 3 and the above-quoted references in subdivision 2 to the standard of living established during the marriage and the loss of employment opportunities and benefits, does not specify retroactivity. Nor does the act, approved on May 31, 1985, specify an effective date other than August 1. Minn.Stat. § 645.02 (1986). Nevertheless, the legislature has clearly manifested its unmistakable intention that the 1985 enactment was not intended to change the intent of the statute but only to correct the interpretation. 1985 Minn.Laws ch. 266, § 2 is entitled "An act * * * clarifying factors to consider in awarding maintenance in marriage dissolution actions." We have previously held that a clarifying act is to be read into statutory law retrospectively. *Holman v. All Nation Ins. Co.*, 288 N.W.2d 244 (Minn.1980). Even more compelling evidence of an intent that the clarification should have retrospective application is found in the legislative history of this amendment to Minn.Stat. § 518.552.[10]

10. Speaking before the Senate Judiciary Committee, Senator Ember Reichgott, an author of

■ It is not apparent from the trial court's findings and conclusions, whether there was any consideration given to the factors necessary to a determination of the amount and duration of maintenance. When the statutory criteria are applied, however, it is apparent not only that Ralph properly recognized the need for maintenance but that the award should have been permanent.

Although Marguerite's share of the marital property will be significantly enhanced by the revaluation and reapportionment of Nardini of Minnesota, it appears that more than her share of the marital property will be required to provide for her reasonable needs, especially when the standard of living established during the marriage is taken into consideration. The trial court found that although she suffers from a severe chronic skin disease, Marguerite is "an able bodied woman capable of employment and training for employment." That Marguerite is an intelligent and capable person is, however, only a partial answer to the question: Is the spouse seeking maintenance able "to provide adequate self-support, after considering the standard of living established during the marriage and all relevant circumstances, through appropriate employment"? *See* Minn.Stat. § 518.-552, subd. 1(b) (1986). Being capable of employment and being appropriately employed are not synonymous, a fact recognized in statutory systems such as workers' compensation and unemployment compensation. Twenty-nine years after leaving the labor market to become a homemaker, Marguerite must reenter the labor force at age 56, possessed of only a high school education and without special employment skills of any kind. Although both homemaking and volunteer work undoubtedly contribute to the development of a good many skills, it is safe to say that few employers regard them as marketable skills or credit the homemaker/volunteer with work experience. Training will further delay entry into the labor market. The plight of the older worker whose employment is terminated is well documented. *E.g.,* National Association of Office Workers, *Vanished Dreams: Age Discrimination and the Older Woman Worker* (1980). It is hardly to be expected that a 30–year hiatus in the applicant's employment history enhances the employment prospects of the older applicant. Nor is Marguerite's ability to secure employment the only unanswered question. The amount she can earn is even more speculative.[11]

Moreover, 35 years ago the role of each spouse was clearly defined: the husband provided the family's economic support and the wife was the homemaker who reared the children and supported the family in noneconomic ways. The traditional marriage of that day contemplated sharing all property and income and viewed the wife's efforts to build the husband's career and earning power, however evidenced, as investments in their shared future. Weitzman, *The Economics of Divorce: Social and Economic Consequences of Property, Alimony and Child Support Awards,* 28 UCLA L.Rev. 1181 (1981). We have held that on dissolution of a traditional marriage the husband's career and earnings should not be capitalized as an asset subject to distribution. *Rogers v. Rogers,* 296 N.W.2d 849 (Minn.1980). If, on reconsideration, the value of Nardini of Minnesota

---

the 1985 amendment to section 518.552, said that the purpose of the 1985 bill was to confirm that temporary maintenance should not be favored over permanent awards—"that both should be equal options." Senator Reichgott stated that section 518.552 had been amended in 1982 in response to this court's decision in *Otis v. Otis,* 299 N.W.2d 114 (Minn.1980), "to make it very, very clear that in fact we do want permanent spousal maintenance to be an option and that rehabilitative alimony should not in any way preclude the possibility of permanent spousal maintenance."

Hearing on S.F. 623 before the Senate Judiciary Committee, 74th Leg., (March 22, 1985).

**11.** The reasonable expectations of unskilled, inexperienced middle-aged women entering the work force are necessarily modest.

Mean earnings from employment for 1985:

| | |
|---|---|
| Men—all workers | $21,113 |
| Men—full time workers | 27,414 |
| Women—all workers | 11,109 |
| Women—full time workers | 17,028 |

*Money, Income and Poverty Status of Families and Persons in the United States,* Consumer Income Sources P60–No. 154 (1985).

were to be based on liquidation value, the capitalized value of Ralph's salary and benefits would necessarily be excluded from the process, as would consideration of any value attributable to goodwill. If the corporation were to be valued as a going business, value attributable to goodwill can be included without improperly capitalizing the salary and benefits of key personnel. Whatever the ultimately declared value of Nardini of Minnesota, it and the other family corporations have all been awarded to Ralph. That may be a sensible allocation as to Nardini of Minnesota because it leaves the corporation's key man in place. It must be recognized, however, that the distribution made here involves something more than allocating the corporate shares to Ralph as his sole property. It permits Ralph to retain the vehicle which enhances his earning power and it affords him the opportunity to continue building the value of his interest in the business while receiving an annual salary in excess of $90,000 plus substantial perquisites.

At the same time, however, that Ralph's career is left intact and basically undisturbed, the distribution alters the course of Marguerite's life. While Ralph continues his gainful employment, Marguerite is deprived of any interest in the ongoing business which has until now been the focus of her efforts and the source of her income as well as of Ralph's, and after foregoing the opportunity to carve out a separate business career which might survive a marriage dissolution, she is instead expected to abandon what she has known as a career as a homemaker and embark on some undefined new career.

It seems to us most unlikely that Marguerite can realize an annual income from investments and employment that approaches the $100,000 mark, no matter how skillfully she invests her share of the marital assets and no matter how hard she labors. Certainly, dissolution of a long-term marriage creates financial problems for both parties and equity does not demand absolute parity in their post-dissolution positions, but the bulk of the economic burden should not be visited on one party without regard to the parties' standard of living during the marriage and without regard to that party's now limited ability to complete in the labor market.

Had Marguerite pursued her own business career during the marriage or had the marriage been of shorter duration and the parties younger at the time of its dissolution, there might be no need for permanent maintenance. The best that can be said, however, of the prospect of Marguerite's becoming fully self-supported through a combination of income from investments and employment is that it is uncertain at this time. The statute requires that uncertainty to be met by an award of permanent maintenance with the order left open for later modification. Minn.Stat. § 518.552, subd. 3 (1986). That the trial court retains jurisdiction over a temporary award does not make temporary maintenance an acceptable alternative when it is uncertain that the spouse seeking maintenance can ever become self-supporting. An award of temporary maintenance is based on the assumption that the party receiving the award not only should strive to obtain suitable employment and become self-supporting but that he or she will attain that goal. Although equity would support modification of the temporary award if that person cannot become fully self-supporting during the period of the temporary award, a petition for modification does not comfortably fit the statutory format. The basis for modification of an award of maintenance is a change of circumstances which makes the terms of the award unreasonable or unfair—substantially increased or decreased earnings or need of a party, receipt of public assistance, or a change in the cost-of-living. Minn.Stat. § 518.64 (1986). Although the court is required on a motion for modification to apply, in addition to all relevant factors, the factors for an award of maintenance under section 518.552, the person who cannot secure employment or who can become only partially self-supporting is hard pressed to meet the burden of proving either that the petitioner's earnings have decreased or his or her need has increased. The actual fact is that the change in the petitioner's circumstances is

insufficient or nonexistent, yet by the terms of the decree maintenance is to cease. On the other hand, if there is a change in the earnings or needs of the maintenance payer which makes the terms of the award unfair or unreasonable, the change will support a petition for modification. Thus, if Ralph's financial circumstances deteriorate because of his retirement or for some other reason or if Marguerite's circumstances improve so that the terms of the award are no longer fair and reasonable, Ralph may seek reduction or termination of maintenance.

Because the trial court made no findings with respect to the needs of either party and because the trial court has yet to value and apportion Nardini of Minnesota, we can neither review the propriety of the amount of the maintenance award nor provide any specific instructions or guidance with respect to the determination of the amount. While the need for permanent, as opposed to temporary, spousal maintenance is readily apparent in a situation such as that presented here, the delicate balancing of property division and spousal maintenance necessary to place the parties in comparable financial positions is reserved to the good judgment of the trial court. That task is not an easy one. It is no accident that Solomon gained his reputation in the field of family law. We remand to the trial court for an award of permanent spousal maintenance in an appropriate amount determined in accordance with the criteria set out at Minn.Stat. § 518.552 (1986).

### III.

#### Attorney Fees.

Marguerite also contends the failure to award her attorney fees constitutes an abuse of discretion. While the court may, after considering the financial resources of both parties, require one party to pay a reasonable amount necessary to enable the other spouse to carry on or contest the proceeding, the failure to award attorney fees cannot be characterized here as an abuse of discretion where the property and income of the parties, following the reapportionment of the marital property and

the award of permanent maintenance, should be relatively evenly balanced.

Affirmed in part, reversed in part, and remanded for further proceedings in conformity with this opinion.