**In re the Marriage of Lisa Jean PASSOLT, petitioner, Respondent,**

v.

**Jeffery Robert PASSOLT, Appellant.**

**No. A10–1151.**

Court of Appeals of Minnesota.

Aug. 22, 2011.

Kristy A.K. Rodd, Judy S. Engel, Fredrikson & Byron, Minneapolis, MN, for respondent.

Brian L. Sobol, Corwin R. Kruse, Katz, Manka, Teplinsky, Graves & Sobol, Ltd., Minneapolis, MN, for appellant.

Considered and decided by BJORKMAN, Presiding Judge; HALBROOKS, Judge; and HUDSON, Judge.

## OPINION

HUDSON, Judge.

Appellant-husband challenges the district court's dissolution judgment granting respondent-wife permanent maintenance, but declining to include a prospective step-reduction, despite the district court's finding that wife is likely to become partially self-supporting after a year of retraining. Appellant also argues that the district court clearly erred in its division of the parties' golf-club membership. Because the district court erred by concluding that Minnesota appellate caselaw precludes the district court from considering a maintenance recipient's ability to become fully or partially self-supporting absent the maintenance recipient's bad faith unemployment or underemployment, we reverse the award of maintenance and remand for further proceedings on that issue. We affirm the district court's property division.

## FACTS

The district court dissolved the 30–year marriage of appellant Jeffrey Robert Passolt (husband) and Lisa Jean Passolt (wife) by amended judgment in May 2010. The parties, both 52 years old at the time of the dissolution, have two children. Their younger child was scheduled to graduate from high school in 2010.

When the dissolution judgment was entered, husband was employed as a television news anchor and was also under contract to a radio station, earning a gross annual income of approximately $525,000. Wife was employed part-time as a fitness-class instructor, earning a gross annual income of approximately $3,000. Wife has an undergraduate degree in education. She obtained a special-education teaching license and taught special education for five school years after the parties' marriage. But after the parties' first child was born in 1985, she did not return to full-time work, working only part-time and participating in volunteer activities, such as coaching dance line and tennis at the high-school level. She also homeschooled the parties' younger child until high school.

In the dissolution proceeding, the parties reached agreement on most issues. The district court tried the questions of spousal maintenance and certain property-division issues. At trial, husband presented evidence indicating that employment opportunities are available for special-education teachers, and that after wife updates her certification, it would be feasible for her to obtain full-time employment, earning a gross income of approximately $37,000, based on her five years of previous teaching experience. That expert testified that, based on wife's transferrable skills, experience, and educational level, she would be employable as a special-education teacher, and her long-term absence from the full-time job market would not impact her ability to find a job in that field. Wife also presented testimony from a vocational expert, who testified that, although wife is not immediately qualified to work as a special-education teacher and would need a rehabilitation plan, a current demand exists for special-education teachers, and wife has the ability to perform highly-skilled employment with the proper credentials. Wife's additional expert, the director of educational licensing for the Minnesota Department of Education, testified that wife would need to obtain 125 hours of additional professional training to become relicensed as a teacher and that, if she were to return to school, it is possible that she could be relicensed within one year.

Wife testified that she did not return to work after the birth of the parties' first child because husband's job required an extensive time commitment, and the parties agreed that she needed to be at home. She testified that husband never asked her to return to work full-time because he wanted her to be available to spend time with the family. She testified that she did not intend to return to full-time work because she had enjoyed being a stay-at-home mother and had volunteer commitments. She also testified that she planned to assist the parties' younger child academically during the first year of college.

Wife testified that the parties enjoyed a lifestyle that included time at a Wisconsin cabin and a Florida property, with frequent restaurant meals. She testified that she did not have a budget during the marriage. Husband testified that he attempted to make sure that the family had economic security and did not have to worry about finances. He testified that he did not wish for wife to work outside the home when the children were young, but that the parties had discussed the possibility that she would return to work when the parties' younger child entered high school.

In 2005, the parties purchased an equity golf and tennis membership at a country club in Florida for an amount in between $40,000 and $50,000. Wife testified that the membership is currently worth $38,000; that there is a waiting list of memberships to be sold; and that a non-equity membership, which could not be sold, could be purchased for $17,000. She believed that the membership also had value based on a member's ability to use all of the facilities. Husband testified that there are numerous people on the waiting list to sell equity memberships; that there is no reasonable possibility of selling the membership; and that the club is attempting to generate cash flow by selling non-equity memberships at $17,000. He testified that the parties' membership includes the waiver of green fees, which are approximately $100 per round of golf, and when he is in Florida he frequently plays golf.

In its dissolution judgment, the district court assigned a value of $17,000 to the country-club membership. The district court also issued separate findings of fact and a memorandum of law regarding

spousal maintenance. The district court found that wife could obtain her special-education license by taking eight semester hours of classroom education, representing 125 hours of continuing education; that both parties presented experts who testified that a demand exists for special-education teachers; and that after becoming licensed, wife could reasonably be expected to obtain a full-time special-education teaching position, with a reasonable starting salary of approximately $36,000 annually. But the district court also found that, given wife's long-term absence from the workforce, she was not intentionally limiting her income.

The district court found that, based on the parties' very high marital standard of living, wife would have reasonable monthly living expenses of $12,286 after the younger child's emancipation and the sale of the marital homestead, and husband had reasonable monthly living expenses of $11,986. Based on the parties' respective employment incomes, reasonable expenses, and investment income, the district court found that husband has the ability to pay, and wife would have need of, $17,175 per month permanent spousal maintenance until the parties' minor child became emancipated in June 2010, and $16,740 per month permanent spousal maintenance beginning July 1, 2010.[1] The district court granted wife permanent maintenance in that amount.

In its thorough memorandum of law, the district court concluded that, in ordering maintenance, it is not permitted to impute income to wife without a finding of bad-faith unemployment or underemployment.

In its reasoning, the district court relied on principles expressed in *Carrick v. Carrick*, 560 N.W.2d 407 (Minn.App.1997), and related appellate caselaw. This appeal follows.

## ISSUES

I. Did the district court err by concluding that Minnesota law precludes consideration of wife's prospective ability for self-support in determining maintenance?

II. Did the district court abuse its discretion in its valuation of the golf-club membership?

## ANALYSIS

### I

■ When determining the amount and duration of a maintenance award, the district court must consider, among other things, the ability of the party seeking maintenance "to meet needs independently." Minn.Stat. § 518.552, subd. 2(a) (2010). Husband challenges the district court's reading of our caselaw addressing the proper method for determining maintenance when a maintenance recipient continues his or her pre-dissolution employment after dissolution. According to the district court, before maintenance can be set based on a maintenance recipient's prospective ability to provide self-support, the recipient must be found to have limited his or her income in bad faith. For two reasons, we conclude that the district court misapplied the law regarding spousal maintenance.

---

1. On appeal, husband has not challenged the district court's finding that wife would have total assets available for investment of $58,137.22, after the division of marital property, an equalizer payment to wife, and wife's additional expenses of a down payment on a home and reasonable attorney fees. Husband has also not challenged the findings of the parties' reasonable monthly expenses, nor has he argued that wife's expenses do not reasonably support a need for the amount of maintenance awarded, apart from consideration of the retraining issue.

First, "[w]hen the words of a law ... are clear and free from all ambiguity, the letter of the law shall not be disregarded." Minn.Stat. § 645.16 (2010). In that situation, "further construction is neither necessary nor permitted." *Owens v. Water Gremlin Co.*, 605 N.W.2d 733, 736 (Minn. 2000). Minn.Stat. § 518.552 (2010) unambiguously does not require a finding that a maintenance recipient has limited his or her income in bad faith in order to set maintenance based on the recipient's post-retraining ability to meet needs independently. When determining the amount and duration of a maintenance award, the district court is to consider factors that include the time necessary for the recipient "to acquire sufficient education or training to enable [him or her] to find appropriate employment," and the recipient's probability "of completing education or training and becoming fully or partially self-supporting." Minn.Stat. § 518.552, subd. 2(b). The statutes does not, however, require the district court to find that the recipient has limited his or her income in bad faith to set maintenance based on the recipient's ability to meet needs independently post-rehabilitation. This reading of Minn.Stat. § 518.552 is consistent with recent caselaw. *See, e.g., Rauenhorst v. Rauenhorst*, 724 N.W.2d 541, 543–44 (Minn.App.2006) (rejecting the requirement for finding of bad faith when district court found that maintenance recipient did not need retraining to support herself); *Schallinger v. Schallinger*, 699 N.W.2d 15, 22 (Minn.App.2005) (refusing to apply *Carrick* where the district court found that the maintenance recipient was partially self-supporting and did not need maintenance because she had the ability to work full-time, but decided not to do so), *review denied* (Minn. Sept. 28, 2005).

We also conclude that the district court misapplied the law regarding spousal maintenance based on its reading of *Car-*

*rick; Nardini v. Nardini*, 414 N.W.2d 184 (Minn.1987); and *Maurer v. Maurer*, 607 N.W.2d 176 (Minn.App.2000), *rev'd on other grounds*, 623 N.W.2d 604 (Minn.2001). The district court interpreted those cases to stand for the proposition that, when a maintenance recipient continues pre-dissolution employment after the marriage is dissolved, the district court must find that the maintenance recipient limited his or her income in bad faith in order to set maintenance based on findings that the recipient's ability to provide self-support is greater than his or her actual income. As set out below, we read those cases differently. "The appropriate standard of review" for an issue "involving the application of existing case law is de novo." *Collins v. Minn. Sch. of Bus., Inc.*, 655 N.W.2d 320, 329 (Minn.2003).

In *Carrick*, "[b]ecause [the wife] worked only part time and did not seek to change her employment situation after the parties separated, the [district] court found [the wife] 'acted in bad faith by remaining intentionally underemployed' and imputed her income to be her earning capacity." 560 N.W.2d at 410. This court recognized that "a [district] court may impute a party's income to be her earning capacity for the purposes of setting maintenance, if it first finds that the party was underemployed in bad faith[,]" but stated that

[a]s a matter of law, however, a court may not find bad faith underemployment where, as here, a homemaker has continued to work the same part-time hours *at the time of dissolution* as she did during the marriage, has been employed in the same type of position as she was during the marriage, and where there is no evidence of any intent to reduce income for the purposes of obtaining maintenance.

560 N.W.2d at 410 (emphasis added). Here, the district court read this portion of

*Carrick,* and what it deemed similar portions of *Maurer* and *Nardini,* to preclude it from considering wife's potential $36,000 future annual salary unless it also found that she had self-limited her income in a bad-faith attempt to increase her maintenance award. It then found that because wife had only minimal employment during the marriage, under *Carrick,* it could not find her to be limiting her income in bad faith if, after the dissolution, she did not retrain and, as a result, continued to have only minimal employment.

The district court, however, misread *Carrick.* *Carrick* addressed a finding in a dissolution judgment that the wife was then underemployed in bad faith. *Id.* The finding was based solely on the fact that, during the parties' separation, the wife had worked the same job and the same number of hours as before the separation. Explaining this court's concern, *Carrick* noted that the district court had determined that the wife was "intentionally underemployed" based on findings that

> [she] has above-average intelligence in numerous respects.... [She] has failed to establish any justifiable reason for not being employed full-time and has intentionally not sought full-time employment without reasonable justification.... [She] also acknowledged there were no medical restrictions precluding full-time employment. The Court further finds that although [the wife] spent several years as a homemaker, she also participated meaningfully in the parties' landscaping business.... [The wife] has several transferable skills which would serve her well in a variety of employment opportunities resulting in wages considerably higher than her current part-time position.

*Id. Carrick* acknowledged that these findings "may constitute a proper assessment of the likelihood that [the wife] will be successful in rehabilitating after the dissolution," but that the district court's "assessment [was] punitive when applied *retroactively* to a traditional homemaker whose work history is of a part-time nature." *Id.* (emphasis added). Thus, *Carrick* focused on the period of time between the parties' separation and the dissolution judgment, and it rejected the district court's finding that the wife had acted in bad faith simply by maintaining, during the parties' separation, the same type and amount of employment she had performed during the parties' marriage.

*Carrick,* however, distinguishes the time before the dissolution from the time after the dissolution, and it does not preclude a determination that a maintenance recipient can, after the judgment, obtain education or training, as well as a job providing greater income than that earned during the marriage and separation. We stated in *Carrick* that

> [t]here is no authority for finding bad faith underemployment *at the time of an initial award of maintenance* merely because a potential obligee has not *yet* rehabilitated when the record indicates the obligee has continued in the same employment and there is no evidence of an intent to reduce income for the purposes of obtaining maintenance. Nor do we find persuasive the [district] court's observation that appellant had received maintenance since the order for temporary relief issued in July 1995 and "has not made any meaningful efforts to obtain full-time employment." *While the trial court might well take into consideration the receipt of maintenance for two years prior to dissolution when establishing the total number of years maintenance will be paid, we are unaware of any authority requiring that a traditional homemaker/part-time employed spouse seeking maintenance must "rehabilitate" and find full-time*

*employment during the period between the temporary order under Minn.Stat. § 518.131 (1996) and the decree of dissolution.*

*Id.* at 410–11 (emphasis added; footnote omitted). And this analysis in *Carrick* applies equally to a situation that does not involve a temporary maintenance award made under Minn.Stat. § 518.131. *See Maurer,* 607 N.W.2d at 182 (stating that "[b]ecause the *Carrick* holding was not premised on the type of maintenance awarded, its holding is equally applicable to cases involving either temporary [i.e., rehabilitative] or permanent maintenance").

Because *Carrick* addressed only the period between the parties' separation and the dissolution judgment, the district court read *Carrick* too broadly to apply to the post-judgment period at issue in this case. *See Stageberg v. Stageberg,* 695 N.W.2d 609, 613 n. 2 (Minn.App.2005) (stating that "the language used in an opinion must be read in the light of the issues presented") (quotation omitted), *review denied* (Minn. July 19, 2005). Similarly, because *Maurer* simply applies *Carrick* in a factually similar situation, our analysis of *Carrick* also addresses *Maurer.*

In *Nardini,* the Minnesota Supreme Court expressed its concern that the district court awarded a wife only temporary monthly maintenance of $1,200 for five years, despite a high marital standard of living and the maintenance recipient's limited education and job skills. *See* 414 N.W.2d at 197–98. The supreme court indicated that, although it could not properly review the district court's award of maintenance because of insufficient findings, the need for permanent maintenance for wife was "readily apparent." *Id.* at 199. The supreme court also stated that while the maintenance recipient "must reenter the labor force[,]" questions remained about whether she could obtain employment and that, even if she did, "[t]he amount she can earn [was] even more speculative." *Id.* at 197. It therefore remanded for the district court to address the maintenance issue "in accordance with the criteria set out at Minn. Stat. § 518.552 (1986)." *Id.* at 199. Like the current version of the statute, the 1986 version states that maintenance shall be determined based on all relevant factors, including

(b) the time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment, and the probability, given the party's age and skills, of completing education or training and becoming fully or partially self-supporting[.]

*Compare* Minn.Stat. § 518.552, subd. 2 (1986), *with* Minn.Stat. § 518.552, subd. 2 (2010). Thus, the supreme court in *Nardini* directed the district court to contemplate the probability that the maintenance recipient could become fully or partially self supporting after re-education or retraining.[2] 414 N.W.2d at 196. For these

---

**2.** In a pre-*Nardini* decision, this court stated that

[p]lainly, rehabilitative maintenance contemplates future self sufficiency of the spouse receiving the award after a period of retraining. A fair reading of the cases and statutory provisions convinces us that similar considerations do not exist when permanent maintenance is awarded. Contrary to the [district] court's conclusion, *appellant*

[who was awarded permanent spousal maintenance] did not incur an obligation to increase her earning power through occupational retraining.

*Sand v. Sand,* 379 N.W.2d 119, 124 (Minn. App.1985) (emphasis added), *review denied* (Minn. Jan. 31, 1986). We reject the emphasized portion of *Sand* indicating that a recipient of permanent maintenance never has an obligation to increase earning power

reasons, we are not convinced that *Nardini* makes bad faith a prerequisite to a district court's consideration of a permanent maintenance recipient's ability for self support after retraining or re-education and a reasonable period to obtain suitable employment.

■ We commend the district court for its thoughtful memorandum addressing this issue. But the maintenance statute requires, as it has since *Nardini*, that, in awarding maintenance, the district court must consider "all relevant factors," including the maintenance recipient's ability to meet needs independently, the time necessary for him or her to acquire education to secure appropriate employment, and the probability that he or she will become fully or partially self-supporting. Minn.Stat. § 518.552, subd. 2. We therefore conclude that the district court read *Carrick, Maurer*, and *Nardini* too broadly by interpreting those cases to require a finding that a maintenance recipient whose post-dissolution employment is the same as that during the marriage must be found to have decreased his or her income in bad faith, in order to consider that recipient's prospective ability for self-support after entry of a dissolution judgment.[3] Therefore, we remand for the district court to reexamine its award of spousal maintenance in light of a correct reading of *Carrick, Maurer*, and *Nardini*.

■ We note that, based on the district court's findings relating to wife's ability to rehabilitate, a step reduction effective upon expiration of wife's retraining may be appropriate. Step reductions may be appropriate to provide employment incentives for a rehabilitating spouse. *Frederiksen v. Frederiksen*, 368 N.W.2d 769, 776 (Minn.App.1985). Further "[district] courts have broad discretion in establishing maintenance plans, including the use of step reductions." *Schreifels v. Schreifels*, 450 N.W.2d 372, 374 (Minn.App.1990). Because we are remanding the question of spousal maintenance, we also remand the question of a step reduction.

## II

■ This court reviews the district court's property division for abuse of discretion and will reverse only for an abuse of that discretion, *Gottsacker v. Gottsacker*, 664 N.W.2d 848, 852 (Minn.2003). This court "will affirm the [district] court's division of property if it had an acceptable basis in fact and principle even though [this court] might have taken a different approach." *Antone v. Antone*, 645 N.W.2d 96, 100 (Minn.2002). A reviewing court will not set aside the district court's findings of fact unless they are clearly erroneous. *Id.* We do not require a district court to be exact in its valuation of assets so long as the value "lies within a reasonable range of figures." *Johnson v. Johnson*, 277 N.W.2d 208, 211 (Minn.1979).

■ Appellant argues that the district court abused its discretion by failing to

---

through occupational retraining. But because increasing one's earning power through occupational retraining may not necessarily lead to economic self-sufficiency, we see no conflict with the additional observation in *Nardini* and *Sand* that, although an award of temporary maintenance contemplates self sufficiency, an award of permanent maintenance does not. *Nardini*, 414 N.W.2d at 198; *Sand*, 379 N.W.2d at 124.

3. This court has previously ruled that a district court may not compute the amount of a maintenance award based on an obligor's earning capacity, absent a finding of the obligor's bad faith or unjustifiable limitation of income. *Melius v. Melius*, 765 N.W.2d 411, 415 (Minn.App.2009). Because our current analysis focuses on the statutory provisions and the caselaw addressing maintenance recipients, while *Melius* addresses the income of the maintenance obligors, we need not address *Melius* here.

delay its valuation and property distribution of the golf-club membership because its current value is too speculative. *See, e.g., McGowan v. McGowan,* 532 N.W.2d 258, 260 (Minn.App.1995) (stating that when the present value of a pension plan is too speculative, district court may reserve jurisdiction for future distribution). But based on the record, we conclude that the district court did not clearly err by finding that the membership had a value of $17,000, less than half its purchase price in 2005, especially when husband used the membership to play golf frequently. On this record, the district court's valuation of the membership has an acceptable basis in fact and principle, and the district court did not abuse its discretion in valuing and distributing the membership.

## DECISION

The district court erred by concluding that, in granting maintenance, it was not permitted to consider wife's prospective ability to become partially or fully self-supporting, without a showing of her bad-faith unemployment or underemployment. We therefore reverse the portion of the judgment relating to maintenance and remand for redetermination of that issue. Because the district court did not abuse its discretion in valuing the parties' golf-club membership or ordering distribution of that asset, we affirm the property division.

**Affirmed in part, reversed in part, and remanded.**