**In re the Marriage of Janet Marie ROBERT, Petitioner, Respondent,**

v.

**John Anthony ZYGMUNT, Appellant.**

**No. C7–02–67.**

Court of Appeals of Minnesota.

Oct. 8, 2002.

James L. Berg, Chaska, MN, for respondent.

Alan C. Eidsness, Lisa T. Spencer, Henson & Efron, P.A., Minneapolis, MN, for appellant.

Considered and decided by HALBROOKS, Presiding Judge, KLAPHAKE, Judge, and SHUMAKER, Judge.

## OPINION

HALBROOKS, Judge.

In this marital-dissolution dispute, appellant John Zygmunt challenges the trial court's award of summary judgment to respondent Janet Robert. Appellant argues that the trial court erred or abused its discretion by concluding that (1) stock purchased from an inheritance trust in exchange for a promissory note secured by the stock itself was nonmarital property, (2) respondent's interest in a Subchapter S corporation's retained-earnings account was nonmarital property, (3) appellant was not entitled to spousal maintenance, and (4) appellant had not shown undue hardship warranting an invasion of respondent's nonmarital property. We affirm.

## FACTS

The 21–year marriage of appellant John Zygmunt and respondent Janet Robert was dissolved by judgment and decree on April 19, 2000. The parties have one child, now emancipated. Respondent's family owns Siegel–Robert, Inc. (Siegel–Robert), a closely held corporation. Respondent's parents gave respondent several individual gifts of Siegel–Robert stock both before and during the parties' marriage and gave appellant individual gifts of stock during the marriage. The parties agree that these separate gifts of stock are the nonmarital property of each party.

During their marriage, the parties lived a relatively modest lifestyle financed almost exclusively by respondent's distributions from her Siegel–Robert stock. By profession, appellant is a playwright and respondent an attorney, but during the marriage neither party worked full-time to support the family or established a career in any specific location. The parties typically held short-term jobs for little or no pay and relocated at will, living in various parts of the United States and Canada until settling near the Twin Cities in 1987.

Respondent's father died in 1996. His will directed that his entire estate, consisting primarily of Siegel–Robert stock, be held in a marital trust, with his wife (respondent's mother) acting as trustee. The will gave respondent's mother a life estate in the trust and divided the remainder interest equally among respondent and her siblings. The will authorized respondent's mother to enter into any transactions necessary to minimize the total tax liability of the estate and its beneficiaries.

Respondent's mother divided the marital trust into three separate trusts, including a qualified terminable interest property trust ("QTIP") that held a controlling interest of Siegel–Robert shares. The estate's tax planner determined that the es-

tate's tax liability would be substantially reduced if the QTIP held only a minority interest in Siegel–Robert by the time respondent's mother died. The tax planner accordingly arranged a stock-purchase transaction whereby respondent and each of her siblings purchased an equal number of shares from the QTIP. The children each signed a promissory note with a 15-year term, a pledge agreement, and a redemption agreement. The promissory notes were secured by the shares to be purchased, which were held by the QTIP trust. The pledge agreement and redemption agreement provided that the children could redeem the shares held by the trust in order to pay the annual installments on the note.

None of the children's spouses signed any of the documents related to the stock-purchase agreement. At the time of trial, respondent had not made any payment on the note using marital or nonmarital funds and had not commingled the QTIP stock with any marital asset. Instead, when the note's first and second annual installments came due, respondent redeemed shares held as security by the QTIP to meet her obligation on the note.

After respondent's father died, the Siegel–Robert board of directors further reduced the corporation's tax liability by voting to convert Siegel–Robert from a Subchapter C corporation to a Subchapter S corporation for tax purposes. *See* I.R.C. §§ 301–385, 1361–1379 (2000) (defining and explaining Subchapter S and Subchapter C corporations). As a Subchapter S corporation, Siegel–Robert does not pay corporate-level taxes on its income. *See* I.R.C. § 1363. Instead, the corporation's income is taxed directly to its shareholders based on their ownership of corporate stock, whether or not the income is actually distributed to the shareholders. *See* I.R.C. §§ 1366–1368. A Subchapter S corporation monitors its re-

tained corporate earnings using an accumulated adjustments account ("AAA"), which is used to determine each shareholder's basis for taxed but undistributed corporate income. *See id.* Siegel–Robert's AAA monitored the amount of income attributable to respondent's shares in the corporation. Although this undistributed income was taxed to respondent and appellant on the parties' joint income-tax returns, Siegel–Robert, and not the parties, always paid the tax; no marital assets were ever used for this purpose. Siegel–Robert never set aside an account for respondent with any funds in it, and no funds were ever distributed to either party from the AAA.

At the time of dissolution, respondent was working ten hours a month for nominal wages and receiving $360,000 net annual income from Siegel–Robert in stock distributions and director's fees; appellant was pursuing his playwriting career but earning no income.

Before trial, the court granted respondent summary judgment as to the QTIP stock, agreeing with respondent's argument that the stock was not marital property subject to division. The trial court reasoned that the stock-purchase agreement, as an estate-planning device, did not transform respondent's remainder in the family trust from nonmarital to marital property, but merely accelerated respondent's possession of the nonmarital bequest.

After a trial on the remaining issues, the trial court concluded that the AAA was also nonmarital property, reasoning that because Siegel–Robert always paid the tax burden created by the AAA and only nominally borne by the parties, the AAA had no effect on the parties' marital assets or income. The trial court also concluded that appellant was not entitled to spousal maintenance and that appellant had dem-

onstrated no special hardship entitling him to a portion of respondent's nonmarital property. This appeal follows.

## ISSUES

1. Was the Siegel–Robert stock respondent purchased from the QTIP marital property?
2. Was respondent's basis in the Siegel–Robert retained-earnings account marital property?
3. Did the trial court properly deny appellant spousal maintenance?
4. Did the trial court properly decline to invade respondent's nonmarital property to alleviate appellant's financial hardship?

## ANALYSIS

### I.

Appellant challenges the trial court's conclusion that the QTIP stock respondent acquired pursuant to the stock-purchase transaction remained a nonmarital asset, arguing that the stock became divisible marital property when respondent purchased it from the trust. We disagree and hold that the trial court did not err by granting respondent summary judgment on this issue.

█ We review appeals from grants of summary judgment to determine "(1) whether there are any genuine issues of material fact and (2) whether the lower courts erred in their application of the law." *State by Cooper v. French*, 460 N.W.2d 2, 4 (Minn.1990) (citation omitted); *see also* Minn. R. Civ. P. 56.03. We need not defer to the trial court's decision on a pure question of law. *Frost–Benco Elec. Ass'n v. Minnesota Pub. Utils. Comm'n*, 358 N.W.2d 639, 642 (Minn.1984). "Whether property is marital or nonmarital is a question of law, but a reviewing court must defer to the trial court's underlying findings of fact." *Olsen v. Olsen*, 562 N.W.2d 797, 800 (Minn.1997) (citation omitted).

█ All property obtained by either spouse during the marriage is presumed to be marital property. Minn.Stat. § 518.54, subd. 5 (2000). "To overcome the presumption that property is marital, a party must demonstrate by a preponderance of the evidence that the property is nonmarital." *Olsen*, 562 N.W.2d at 800 (citation omitted); *see also* Minn.Stat. § 518.54, subd. 5. Nonmarital property includes property that is acquired as a bequest made to one spouse but not to the other, as well as a party's remainder interest inherited in property subject to a life estate. Minn.Stat. § 518.54, subd. 5(a), (c); *Theroux v. Boehmler*, 410 N.W.2d 354, 357 (Minn.App.1987). For property to retain its nonmarital character, it must be kept separate from marital property or be readily traceable to an identifiable nonmarital asset. *Olsen*, 562 N.W.2d at 800.

█ Appellant acknowledges that respondent's remainder interest in the QTIP is nonmarital, but argues that the stock purchased from the QTIP, as property obtained during the marriage in exchange for a marital debt, was presumptively marital. *See* Minn.Stat. § 518.54, subd. 5. He asserts that the stock-purchase transaction did not merely accelerate respondent's remainder interest while preserving its nonmarital character, but converted it from respondent's inheritance to divisible marital property.

Although there is some merit in appellant's arguments, the terms and circumstances of the stock-purchase transaction here lead us to conclude that the stock purchased by respondent from the QTIP remained nonmarital property. First, we do not agree that the promissory note exchanged for the stock represented a marital debt. It is undisputed that re-

spondent had a nonmarital remainder interest in the QTIP stock prior to the stock-purchase transaction and that the promissory note was secured by the QTIP stock itself, which remained in the trust's possession. By the terms of the stock-purchase agreement, respondent is entitled, and has consistently chosen, to surrender the shares held as security in order to meet her obligations under the note, effectively using the stock to pay for itself. We conclude that because the promissory note was secured wholly by respondent's non-marital remainder interest in the QTIP and involved no personal or marital assets, it was not a marital debt.

Consequently, the QTIP stock acquired by respondent pursuant to the stock-purchase transaction was not marital property. We have previously held that an estate-planning device designed to minimize tax burdens does not alter the marital or nonmarital character of property. *See Pfleiderer v. Pfleiderer*, 591 N.W.2d 729, 732–33 (Minn.App.1999) (holding that "transferring joint property into one party's name for estate planning purposes does not convert marital property into nonmarital property"). Here, the stock-purchase transaction was developed by an estate planner in order to further the goal, as expressed by respondent's father in his will, of reducing the tax liability of the estate and its beneficiaries. The transaction was designed so that payment for the stock purchase could be generated from the stock itself, with no contribution of marital or personal assets. On these facts, we conclude that the stock purchased from the QTIP, which was respondent's nonmarital property before the transaction, did not become marital property by operation of the estate-planning device.

Appellant argues that respondent's remainder interest is strictly limited to the assets of the QTIP at the time of her mother's death and that when respondent placed a promissory note in the QTIP in exchange for the stock, she acquired a remainder interest in the promissory note and lost her nonmarital interest in the stock. He therefore contends that respondent's stock is marital property. But respondent indisputably had a nonmarital remainder interest in the stock held in the QTIP, subject to a life estate in her mother, prior to the stock-purchase transaction. Respondent purchased the stock from the trust in a transaction secured by the stock itself and involving no marital funds. While there are circumstances under which a party's purchase of nonmarital property could convert the property into marital property, no such circumstance is present here because the stock was not commingled with marital property and because the funds for its purchase were generated by, and were, therefore, directly traceable to the stock itself. *See Olsen*, 562 N.W.2d at 800. Here, respondent secured the purchase with nonmarital assets, made no initial down payment for the stock, signed the purchase agreement, and has only made payments on the note by authorizing the QTIP to redeem shares in its possession.

Under these circumstances, we conclude that the promissory note signed by respondent was not a marital debt of the parties. Consequently, the QTIP stock acquired by respondent pursuant to the stock-purchase transaction remained a nonmarital inheritance after the transaction. Because the evidence was sufficient to rebut the presumption that respondent's QTIP stock purchase was marital, the trial court did not err in granting respondent summary judgment on this issue.

**II.**

Appellant challenges the trial court's conclusion that the Siegel–Robert

AAA is respondent's nonmarital property, arguing that the AAA is marital property because it contains earned income taxed to the marital estate and because its value is attributable to respondent's efforts. Whether a Subchapter S corporation's retained earnings are marital property is an issue of first impression in Minnesota.

■ We note first that the Siegel–Robert AAA is not "income" under the plain meaning of Minn.Stat. § 518.54, subd. 6 (2000), which defines "income" as "any form of periodic payment to an individual." Although the Internal Revenue Code treats AAA earnings as income attributable to individual shareholders for federal tax purposes, there is no evidence in the record before us that an asset-bearing account was set aside by Siegel–Robert for respondent or that any amounts were, or will be, held in such an account or distributed to either party. Retained earnings and profits of a corporation are a corporate asset and remain the corporation's property until severed from other corporate assets and distributed as dividends. *See Hoffmann v. Hoffmann*, 676 S.W.2d 817, 827 (Mo.1984). Respondent agrees that Siegel–Robert dividends actually paid to the parties were marital property. But because Siegel–Robert never distributed the retained earnings to respondent, the earnings never became respondent's income under Minn.Stat. § 518.54.

Appellant argues that the AAA must be considered a marital asset because the income allocated to the AAA was taxed to the parties as income earned. But appellant does not contend, and there is no evidence, that any marital assets were used to pay the tax on the retained earnings associated with respondent's shares of Siegel–Robert stock.

There is no evidence that respondent has the right to distribute the AAA to herself or other Siegel–Robert shareholders. Appellant's reliance on *Metz–Keener v. Keener*, 215 Wis.2d 626, 573 N.W.2d 865, 866–68 (1997), for the proposition that a Subchapter S corporation's AAA is marital property is therefore misplaced because there, the party was the sole shareholder and manager of the corporation, had full access to the retained earnings, and could distribute the earnings at will. Appellant has not cited any authority—and we are not aware of any—that would require us to consider a party's interest in a corporation's retained earnings to be a marital asset where the party, like respondent here, is a minority shareholder, plays little to no role in the daily management of the corporation, and lacks control over the distribution of the corporation's income. Indeed, our research indicates that, consistent with *Metz–Keener*, courts in other jurisdictions will only consider a corporation's retained earnings to be a party's income if the party has substantial control over a corporation's earnings or is the sole stockholder. *See, e.g., Bleth v. Bleth*, 607 N.W.2d 577, 579 (N.D.2000); *Mitts v. Mitts*, 39 S.W.3d 142, 148 (Tenn.Ct.App. 2000).

Here, the AAA was created when respondent and the other members of the Siegel–Robert board of directors voted to convert Siegel–Robert into a Subchapter S corporation. Appellant argues that the retained earnings are marital property because they are attributable to respondent's entrepreneurial efforts during the marriage. *See Nardini v. Nardini*, 414 N.W.2d 184, 192 (Minn.1987) (holding that an increase in the value of nonmarital property attributable to the efforts of one or both spouses during marriage is marital property); *White v. White*, 521 N.W.2d 874, 878 (Minn.App.1994) (stating that such efforts include a party's contribution of funds, labor, or entrepreneurial deci-

sion-making to the nonmarital property). We disagree.

We have held that an individual who is a board member, officer, and employee of a corporation controlled by his family, but who is not involved in the key functions of the business and only minorly involved in the business, does not contribute an effort to the corporation's income. *Duffey v. Duffey,* 416 N.W.2d 830, 833 (Minn.App. 1987), *review denied* (Minn. Feb. 24, 1988). Here, respondent plays no role in the management or day-to-day operation of the corporation, and she is not a corporate officer or employee. We do not agree with appellant that by attending quarterly board meetings, voting annually on distributions, and voting once to alter the corporate tax structure, respondent engaged in the kind of active effort contemplated by *Nardini* or entrepreneurial decision-making described in *White.*

The AAA is not a distributive, asset-bearing account attributable to either party's marital effort but rather is a notational device designed to measure the income attributable to respondent's Siegel–Robert shares for federal tax purposes. We, therefore, hold that the AAA was not a marital asset and affirm the trial court's determination that the account is respondent's nonmarital property.

## III.

 Appellant argues that the trial court abused its discretion by denying his request for spousal maintenance. A trial court has broad discretion in determining spousal maintenance, and we will not overturn the trial court's decision absent an abuse of discretion. *Erlandson v. Erlandson,* 318 N.W.2d 36, 38 (Minn.1982). A trial court abuses its discretion by resolving the matter in a manner that is "against the logic and the facts on the record." *Rutten v. Rutten,* 347 N.W.2d 47, 50

(Minn.1984). That the record might support findings other than those made by the trial court does not render the findings clearly erroneous, and we view the "evidence in the light most favorable to the trial court's findings." *Vangsness v. Vangsness,* 607 N.W.2d 468, 474 (Minn. App.2000). When reviewing the evidence regarding spousal maintenance, we leave credibility determinations to the fact-finders because they are in the best position to make such assessments. *Prahl v. Prahl,* 627 N.W.2d 698, 702 (Minn.App.2001).

A spousal-maintenance award is appropriate when one spouse demonstrates that he or she lacks sufficient property to provide for his or her reasonable needs or is otherwise unable to reasonably provide adequate self-support. Minn.Stat. § 518.552, subd. 1 (2000). In determining the amount and duration of a maintenance award, a court should consider (1) the financial resources of the party seeking maintenance; (2) the likelihood of the party seeking maintenance becoming fully or partially self-supporting given the party's age and skills or ability to learn new skills; (3) the standard of living established during the marriage; (4) the duration of the marriage; (5) the loss of earnings, seniority, retirement benefits, and other employment opportunities forgone by the spouse seeking spousal maintenance; (6) the age and the physical and emotional condition of the party seeking maintenance; (7) the ability of the other spouse to meet his or her needs while also meeting those of the spouse seeking maintenance; and (8) the contribution of each party to the marital property and to the furtherance of the other's employment or business. Minn. Stat. § 518.552, subd. 2 (2000).

First, we observe that appellant has significant financial resources at his disposal. His final property award exceeded $670,000. The parties stipulated that

appellant can earn more than \$32,000 annually in returns on his investments. A vocational expert testified at trial that appellant is capable of earning more than \$30,000 annually as a copywriter. The record does not support appellant's contention that the trial court miscalculated his expenses by disregarding various taxes and expenses. Nor does the record support appellant's contention that the trial court's denial of spousal maintenance is an abuse of discretion because it deprives him of the opportunity to maintain the standard of living the parties enjoyed during their marriage. The record is clear that the parties' lifestyle for 18 of the marriage's 21 years was modest. The trial court properly refused to give greater weight to the parties' lifestyle in the final years of the marriage, when respondent's income increased due to her father's death. Appellant's contention that he is "entitled" to pursue his chosen nonremunerative vocation and be "amply supported" by respondent is without merit.

Appellant argues that the trial court improperly imputed income to him without finding that he is underemployed in bad faith; in support, he erroneously relies on *Maurer v. Maurer*, 607 N.W.2d 176 (Minn.App.2000), *rev'd on other grounds*, 623 N.W.2d 604 (Minn.2001), and *Carrick v. Carrick*, 560 N.W.2d 407 (Minn.App. 1997). In each of those cases, we held that the district court had erred by imputing income to a longtime homemaker without a finding of bad-faith underemployment. *Maurer*, 607 N.W.2d at 181; *Carrick*, 560 N.W.2d at 410. We reasoned that when a spouse is the homemaker and primary caretaker of the children, imputing income to that spouse without finding bad faith would ignore the spouse's contributions as a homemaker in the marriage and punish her for maintaining the homemaker lifestyle. *Carrick*, 560

N.W.2d at 410; *see also Maurer*, 607 N.W.2d at 181. Here, respondent, not appellant, was the homemaker and primary caretaker of the parties' child. We also observe that appellant's financial and professional circumstances are far removed from those addressed in *Maurer* and *Carrick*, where we considered the diminished earning capacities of female homemakers in so-called traditional marriages. Although appellant's desire to seek remunerative employment may have diminished as a result of the financial support he received from respondent during the marriage, his earning capacity has not. The trial court appropriately imputed income to appellant.

The record does not support appellant's argument that the trial court impermissibly considered his marital misconduct in denying maintenance. The trial court found that the parties frequently failed to communicate, but made no specific finding of fault.

The record is clear that appellant's combined investment income and employment income will be sufficient to meet his monthly expenses. The trial court carefully considered and thoroughly analyzed all of the factors listed in Minn.Stat. § 518.552, subd. 2, and its determination that appellant is capable of self-support without any contribution from respondent has a reasonable and acceptable basis in fact. *Pettit v. Pettit*, 472 N.W.2d 668, 671 (Minn.App.1991) (citation omitted).

## IV.

■ Appellant argues that the trial court abused its discretion by dividing the parties' marital property equally, concluding that appellant suffered no undue hardship warranting an invasion of respondent's nonmarital assets. We disagree, and affirm the trial court's conclusion that

appellant's awards of marital and nonmarital property, which together exceed $670,000, preclude his claim of hardship.

 A trial court can apportion nonmarital property if it finds unfair hardship based on all relevant factors including the length of the marriage, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, needs, and opportunity for future acquisition of capital assets and income of each party. Minn.Stat. § 518.58, subd. 2 (2000). "A very severe disparity between the parties is required to sustain a finding of unfair hardship necessary to apportion nonmarital property." *Ward v. Ward,* 453 N.W.2d 729, 733 (Minn.App. 1990), *review denied* (Minn. June 6, 1990).

Appellant is in good health and possesses marketable skills that, together with his investment income, will enable him to meet his reasonable expenses. Appellant cites no apposite authority to support his argument that he will suffer undue hardship because respondent's financial circumstances are, and will continue to be, significantly better than his own. Respondent's superior financial condition is due to her nonmarital holdings in Siegel–Robert. Appellant's reasonable needs will be met by the trial court's distribution of marital and nonmarital property. A disparity between the parties' post-dissolution assets does not support a claim of hardship. The trial court acted well within its discretion in dividing the marital and nonmarital property.

## DECISION

The trial court did not err by concluding that (1) the QTIP stock remained respondent's nonmarital property following the stock-purchase transaction, (2) the Siegel–Robert AAA was respondent's nonmarital property, (3) appellant was not entitled to spousal maintenance, and (4) appellant suf-

fered no unfair hardship warranting an invasion of respondent's nonmarital property.

**Affirmed.**