*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0417
A14-0428**

In re the Marriage of:
Gregory Ross Wickenhauser, petitioner,
Appellant,

vs.

Denise Esther Wickenhauser, n/k/a Denise Esther Peterson,
Respondent (A14-0417),

and

Greg Wickenhauser,
Appellant,

vs.

Trust B of the Delmar C. Peterson Living Trust dated October 4, 1991; et al.,
Respondents (A14-0428)

**Filed April 20, 2015
Affirmed
Peterson, Judge**

Sibley County District Court
File Nos. 72-FA-11-61, 72-CV-12-85

Kenneth R. White, Law Office of Kenneth R. White, P.C., Mankato, Minnesota; and

Raymond Walz, Walz Law Office, Redwood Falls, Minnesota (for appellant Gregory Ross Wickenhauser)

Tami L. Peterson, Eskens Peterson Law Firm, Chtd., Mankato, Minnesota (for respondent Denise Esther Wickenhauser)

Wade S. Davis, Stinson Leonard, Street LLP, Mankato, Minnesota (for respondents Trust B of the Delmar C. Peterson Living Trust, et al.)

Considered and decided by Peterson, Presiding Judge; Worke, Judge; and Connolly, Judge.

## UNPUBLISHED OPINION

**PETERSON**, Judge

In these consolidated appeals from judgments in a marital-dissolution action and a trust action, appellant-husband argues that the district court (1) erred in finding that respondent-wife has a nonmarital interest in a 136.61-acre parcel of farmland purchased by the parties from trusts created by wife's family and in failing to apply the *Schmitz* formula to the farmland; (2) erred in denying husband's claim of a nonmarital interest in a grain-and-energy account; (3) undervalued an option to purchase property; and (4) erred in finding that husband failed to show damages as a result of the trusts precluding him from farming certain land in 2013. We affirm.

## FACTS

Appellant-husband Gregory Ross Wickenhauser and respondent-wife Denise Esther Wickenhauser, n/k/a Denise Esther Peterson, were married in 1996. In 2010, husband began a marital-dissolution action. The parties stipulated to child-support and some property-division issues.

In December 2011, a trial was conducted on some disputed issues, including the value of a 136.61-acre parcel of farmland (136-acre parcel) purchased by the parties from trusts created by wife's family after the death of wife's father and the value of an option

2

to purchase additional land from the trusts.[1]  During the marriage, the parties bought and sold a 200-acre parcel of farmland, referred to as the Carlson farm.  Husband testified that before selling the Carlson farm, he, wife, and wife's mother had agreed that he and wife would buy the 136-acre parcel and a 12.2-acre building site from the trusts.

In an amended order filed June 15, 2012, the district court made findings regarding the parties' sale of the Carlson farm and purchase of the property from the trusts.  The parties bought the building site during the same month that they sold the Carlson farm, and they bought the 136-acre parcel about seven months later.  The appraised value of the 136-acre parcel was $2,200 per acre, and the parties paid $1,500 per acre for a total purchase price of $204,915.  The parties paid the purchase price with a down payment of $17,115 from the proceeds of the sale of the Carlson farm and a secured loan of $187,800.  The titles to the two properties were conveyed by warranty deeds to husband and wife as joint tenants.

The district court also made findings regarding an option agreement executed by husband and wife in 2005.  The option agreement granted husband and wife an option to purchase an additional 414 acres from the trusts.  The option agreement expires in 2025 or on the death of wife's mother, whichever comes later.  The option agreement provided for a purchase price of $1,500 through 2014 and for recalculation of the purchase price in 2015 and every five years thereafter at a rate of 68% of the average price for bare-land sales in the surrounding area.  The option agreement states that it runs to the benefit of husband and wife but that "[i]f the marriage of [husband and wife] is dissolved, any

---

[1] The land owned by wife's family (the Peterson farm) was held in two trusts.

3

rights [husband] may have under this agreement shall cease, and as to lands [husband and wife] have acquired, [wife] shall have the right to acquire the interest of [husband] as determined by the court handling the dissolution." The option agreement granted wife's siblings a right of first refusal permitting them to purchase the 136-acre parcel, the building site, and the 414 acres for $1,500 per acre through 2014 and as recalculated in 2015 and every five years thereafter.

The district court found:

> 17. In exchange for the right to purchase the remainder of the Peterson Farm at a discounted rate, the parties gave up the right to sell, at fair market value, the property they already owned and any they would acquire from the Trust, without first giving wife's siblings a chance to purchase the property at the discounted rate.
>
> . . . .
>
> 19. Wife understood that purchasing the land for 68% of the appraised value and by receiving the right to purchase the entirety of the farm at the reduced rate, she was giving up any right to any inheritance from the proceeds of the life insurance policy on her mother.
>
> 20. The land subject to the Option to Purchase has not been put up for sale. The Court finds it likely that wife's siblings will exercise their right of first refusal if the land is put up for sale.

While the dissolution action was pending, husband brought an action against respondent trusts and trustees seeking specific performance of his right to purchase real estate under the option agreement and his right to farm the 414 acres under a lease agreement. The dissolution and trust actions were tried jointly to the court. The district court then held two additional days of trial in the dissolution action to address issues of

4

marital and nonmarital property designations, the parties' farming rights, and property valuation and distribution.

Witnesses testified that the main purpose of the trusts was to keep the farm in wife's family. Wife's brother, respondent Darren Peterson, testified that the Peterson farm had been in the family since 1913 and that after his father died, the family began having discussions about how to keep the farm in the family. He testified that the first goal of the trust and option-to-purchase agreements was keeping the farm in the family and making sure that the opportunity to purchase was available to all family members. Respondent-brother Daryl Peterson testified that the number one goal of the trusts was to keep the farm in the family. Certified Public Accountant Charles Morken, whom the Peterson family consulted about setting up the trusts and option to purchase, testified:

> I think the intent of the family was that it was to stay in the Peterson family. That's kind of the core of the whole agreement, that it was really important to the family that it be kept in the Peterson family and they tried to do everything legally that they could to assure that end.

Husband agreed that a purpose of the trusts was to keep the farm in the Peterson family and that he understood that if he and wife got divorced, the Peterson family would be able to get the land back.

There was also evidence that the conveyance, option, and lease agreements were in lieu of an inheritance to wife. Husband testified:

> Q. I'm wondering, did you think if [wife] got the farm she would also get some of the life insurance?
> A. The life insurance, no.
> Q. Why did you have that understanding?

5

A. Because that was the understanding, from what [wife] had told me, that they had decided.

Wife testified:

Q. And then I will direct your attention to the bottom part of it where it appears that there is a note that life insurance would then be divided by four. Can you read the rest of that sentence, please?
A. Life insurance would be divided by 4, [wife's] portion being used up front to reduce the per acre cost of the land.
Q. And so is it your understanding that your inheritance was always part of this land negotiation?
A. Yes.

Daryl Peterson testified:

Q. And do you recall any discussions having to do with inheritance and [wife]?
A. Yes, the agreement was that [wife] would basically get her portion up front in lieu of the cheaper prices on the farm, cheaper agreement.

By order filed May 7, 2013, in the dissolution action, the district court determined that any interest in the 414 acres under the option agreement exceeding $1,500 per acre was wife's nonmarital property and that any value exceeding $1,500 per acre for the 136-acre parcel was wife's nonmarital property.

Findings of fact, conclusions of law, order for judgment, and judgment and decree of dissolution were filed on September 11, 2013. The findings and conclusions are consistent with those in previous orders. The September 11 judgment also addressed funds in the South Central Grain and Energy (SCGE) account. The parties stipulated that each party would receive $102,628.50 from the account for 2009 crop proceeds received after husband and wife's separation. Husband claimed that the $506,870.98 balance

6

remaining in the account after the April 23, 2010 valuation date was income that he earned by farming in 2010 and 2011. But the district court found that husband failed to trace the money in the account to income earned during 2010 and 2011 and rejected husband's claim that the account balance was a nonmarital asset.

Husband moved for amended findings. The district court granted the motion in part, but none of the amended findings are at issue in this appeal.

In the trust action, the district court directed that "if [husband] chooses to proceed with the exercise of the option to purchase, he may do so." The court found that husband failed to prove that he incurred damages as a result of not being allowed to farm the 414-acre parcel under the lease agreement in 2013.

Husband filed separate appeals in the dissolution and trust actions. This court consolidated the appeals.

## DECISION

### I.

"District courts have broad discretion over the division of marital property and appellate courts will not alter a district court's property division absent a clear abuse of discretion or an erroneous application of the law." *Sirek v. Sirek*, 693 N.W.2d 896, 898 (Minn. App. 2005). When dividing property, a district court abuses its discretion when it resolves the matter in a manner "that is against logic and the facts on record." *Rutten v. Rutten*, 347 N.W.2d 47, 50 (Minn. 1984). "This court will affirm the district court's division of property if it had an acceptable basis in fact and principle even though this court might have taken a different approach." *Passolt v. Passolt*, 804 N.W.2d 18, 25

7

(Minn. App. 2011) (quotation and alterations omitted), *review denied* (Minn. Nov. 15, 2011). A property division must be just and equitable but need not be mathematically equal. *Sirek*, 693 N.W.2d at 900.

Property acquired by spouses during marriage is presumed to be "marital property." Minn. Stat. § 518.003, subd. 3b (2014). This presumption can be "overcome by a showing that the property is nonmarital property" because the property was "acquired as a gift, bequest, devise or inheritance made by a third party to one but not to the other spouse." *Id.*, subd. 3b(a). We independently review the district court's determination of whether property is marital or nonmarital, but we defer to the district court's underlying findings of fact. *Baker v. Baker*, 753 N.W.2d 644, 649 (Minn. 2008).

A district court's valuation of an asset is a finding of fact, which we will not set aside unless it is clearly erroneous. *Maurer v. Maurer*, 623 N.W.2d 604, 606 (Minn. 2001). Although a district court need not determine the exact value of an asset, it must reach a value "within a reasonable range of figures." *Id.* (quotation omitted).

*136-acre Parcel*

Husband argues that because the 136-acre parcel was conveyed by warranty deed to husband and wife as joint tenants, the statutory requirement that an inheritance be given "to one but not to the other spouse" was not satisfied, and the district court erred in determining that wife has a nonmarital interest in the property. The joint tenancy does not conclusively show that the parcel is entirely marital property. *See McCulloch v. McCulloch*, 435 N.W.2d 564, 568 (Minn. App. 1989) (stating that "merely transferring

8

title from individual ownership to joint tenancy does not transform non-marital property into marital property" (quotation omitted)).

> The most important factor in determining whether a gift is marital or nonmarital is the donor's intent. To constitute a valid gift inter vivos, the donor must intend to make a gift, the property must be delivered and the donor must absolutely dispose of the property. Although the issue of intent typically concerns whether the donor intended a gift at all, it logically follows that the identity of the donee also turns on the donor's intent. Questions of intent are fact questions. Donative intent is demonstrated by the surrounding circumstances, including the form of the transfer.

*Olsen v. Olsen*, 562 N.W.2d 797, 800 (Minn. 1997) (citations omitted).

The attorney who was involved in the sale of the 136-acre parcel and who drafted the option and lease agreements testified that all of these transactions were part of an estate-planning process intended to keep the farm in the Peterson family. Several other witnesses testified that the main goal of the trusts was to keep the Peterson farm in the Peterson family. The option agreement expressly provides for the termination of any rights husband has under the agreement and any interest he has in lands acquired under the agreement upon dissolution. Although the 136-acre parcel was not acquired under the option agreement, the option agreement was drafted at about the same time that husband and wife purchased the 136-acre parcel, and the right of first refusal in the option agreement applies to the 136-acre parcel. This evidence and the evidence that the conveyance, lease, and option agreements were in lieu of an inheritance to wife are sufficient to overcome the presumption of marital property and support the district court's

9

conclusion that any value in the 136-acre parcel in excess of $1,500 per acre is wife's nonmarital property.

Husband argues that even if the district court properly concluded that wife has a nonmarital interest in the 136-acre parcel, the matter should be remanded for application of the *Schmitz* formula because marital assets were used to purchase the parcel. Under the *Schmitz* formula,

> the increase in the value of nonmarital property attributable to the efforts of one or both spouses during their marriage, like the increase resulting from the application of marital funds, is marital property. Conversely, an increase in the value of nonmarital property attributable to inflation or to market forces or conditions, retains its nonmarital character.

*Nardini v. Nardini*, 414 N.W.2d 184, 192 (Minn. 1987) (applying *Schmitz v. Schmitz*, 309 N.W.2d 748, 750 (Minn. 1981)).

Husband's argument ignores the fact that husband's and wife's ownership of the parcel was encumbered by wife's siblings' right of first refusal. On the valuation date and the date of the final district court order in the dissolution action, wife's siblings had the right to purchase the 136-acre parcel for $1,500 per acre, and the district court found it was likely that they would have exercised that right if the property was sold. The finding that wife's siblings likely would have exercised the right of first refusal is supported by Darren Peterson's testimony that, if the property were sold, one of the siblings, more than likely him, would buy it. Daryl Peterson agreed that one of the siblings would buy it and testified that he would attempt to buy it. Thus, as the district court stated in the memorandum accompanying its order recognizing wife's nonmarital

10

interest in the 136 acres, "if the parties were to attempt to sell the 136 acre parcel at this time, they would be required to first offer it to one or more of [wife's] siblings for $1,500.00 per acre." Consequently, regardless of any increase that there may have been in the market value of the 136 acres, the parties could not sell the property for more than $1,500 per acre. Under these circumstances, we cannot conclude that the district court erred in not applying the *Schmitz* formula to any increase in the property's value.

Husband also argues that under *Schmitz*, the debt should have been allocated to both the marital and nonmarital interests because "[t]he mortgage was incurred in order to secure the entire asset, not just the marital portion." But the $1,500-per-acre purchase price was paid only for the marital interest in the property. Any value in excess of $1,500 per acre was what wife received as a nonmarital interest. The mortgage debt was secured by both the marital and nonmarital interests in the property, but it was incurred in order to purchase only the marital interest. The district court did not err in allocating the entire mortgage debt to the marital interest.

## II.

*SCGE Account*

Husband argues that the district court erred in denying his claim that he had a nonmarital interest in the SCGE account. Because the account was held by the parties during the marriage, husband had the burden of proving the nonmarital character of funds in the account. *See Senske v. Senske,* 644 N.W.2d 838, 841-42 (Minn. App. 2002) (explaining that if property is acquired in exchange for both marital and nonmarital property, the party seeking to prove its nonmarital character must trace an identifiable

11

portion of the property to a nonmarital source); *see also Prahl v. Prahl,* 627 N.W.2d 698, 705 (Minn. App. 2001) (concluding that a portion of property was nonmarital where party identified the value of the property at the time of the marriage).

The district court found:

> 42. It was common practice for [husband] to hold the cash balances in the cooperative accounts and withdraw the funds at later dates, often in subsequent years.
>
> . . . .
>
> 44. [Husband] acknowledged that the [SCGE] account is directly derived from crops. At trial, he read his deposition testimony acknowledging that he did not know from which crop year the funds in the [SCGE] account derived. When asked which year the crops were grown for the account balance, he testified that he believed it came from his 2010 and 2011 crops. He also testified that he did not know whether or not the account balance derived from crops grown in 2009.
>
> . . . .
>
> 46. Furthermore, from the years 2001 through 2011, [husband] reported that the farming operation lost approximately $19,000.00 a year on average during those years. In 2010 and 2011 (the last two years that [husband] farmed), his tax returns report a loss of $21,937.00 and again of $14,714.00 respectively. If [husband] had paid the person who custom farmed the land in 2010 and 2011, the net profits would have been -$22,807 for 2010 and -$18,949 for 2011. These losses are also much less pronounced than they otherwise would have been because of the discounted rent on the lease property and the fact that [husband] and [wife] ultimately paid far less than the actual value for the farm equipment and ethanol stock purchased from Dorothy Peterson after her husband's death. [Husband's] reported income to both the IRS and the Court supports the presumption that the values in the [SCGE] account were

accumulated wealth and not income derived after the parties' separation.

47. If the parties had stopped farming in 2008, 2009 or 2010, [they] would have realized the significant residual account balances in the cooperative accounts. That accumulated wealth would have clearly been a marital asset. The same is true of the account balance at the end of 2011. It is not a one year profit for [husband's] efforts. It is the result of years and years of accumulation of wealth during the parties' marriage. The fact that the amount of the marital assets was not fully apparent until after the parties' farming operation ended in 2011 does not somehow transform the funds into non-marital assets.

. . . .

50. The Court received 75+ pages of statements at trial from SCGE, which purport to be a record of the parties' transactions dating back to 2008. Based upon those statements, the Court is unable to ascertain whether any sums may be attributable to particular crop years. As a result, the Court must find that the [SCGE] assets are the result of accumulation of wealth throughout the parties' 17 year marriage and, as such, are marital assets subject to equitable division between the parties.[2]

These findings are supported by the evidence and are sufficient to support the denial of husband's claim to a nonmarital interest in the SCGE account.

## III.

Husband argues that either his right to exercise the option to buy the 414 acres should have been specifically enforced in the trust action or the district court should have found that the option was a marital asset with value. Husband argues that "[i]f [he] is

---

[2] Husband argues on appeal that "[t]he extensive records from South Central Grain demonstrated that the $647,000 was the result of 2010 and 2011 grain production." But he does not explain how the records demonstrate this.

allowed to close on the option, he secures the 414 acres in his name" and "then has the right to dispose of that property as he sees fit in the future." "Specific performance is an equitable remedy . . . addressed to the sound discretion of the [district] court. . . ." *Lilyerd v. Carlson*, 499 N.W.2d 803, 811 (Minn. 1993) (quotation omitted). Because the dissolution action was pending when husband began the trust action and the option agreement provided for the termination of husband's rights under the option agreement upon dissolution, the district court did not err in declining to specifically enforce husband's right to exercise the option.

Husband is incorrect in arguing that if he is allowed to close on the option, he will have the right to dispose of the property as he sees fit. In the dissolution action, the district court found:

> 22. If either party exercises the option, they will be required to pay $1,500.00 an acre for the property purchased. The purchase price for the entire property is $661,500.00 ($1,500.00 X 441 acres = $661,500.00).[3]

> 23. According to the terms of the Option Contract, [wife] will acquire [husband's] rights in the Option Contract as part of this divorce.

> 24. Given the Court's finding that any value in excess of $1,500.00 per acre is [wife's] nonmarital interest, there is no net gain or marital property to [husband] should he choose to exercise an option. [Husband] has not tendered payment for the property. If he were to buy the property, he would be required to then immediately sell to [wife] the same property for his purchase price. As a result, the decision to exercise the option would result in a zero sum gain in marital assets for the parties.

---

[3] The reference to 441 acres is to total acres, but the parcel is referred to as 414 acres because only 414 acres are tillable.

In his reply brief, husband states that there is no evidentiary support for the factual assertion in wife's brief that wife would likely sell the property to her family members for $1,500 an acre if husband exercised the option to buy and wife was then awarded the property in the dissolution. But the district court's analysis does not assume that wife would sell the property. The district court's determination that wife would be allowed to buy the property from husband for $1,500 an acre is based on the clause in the option agreement stating that if the parties' marriage is dissolved, wife shall have the right to acquire husband's interest as determined by the court handling the dissolution.

**IV.**

Husband sought damages because the trusts precluded him from farming the leased land in 2013. As a general rule, damages in the form of lost profits

> may be recovered where they are shown to be the natural and probable consequences of the act or omission complained of and their amount is shown with a reasonable degree of certainty and exactness. This means that the nature of the business or venture upon which the anticipated profits are claimed must be such as to support an inference of definite profits grounded upon a reasonably sure basis of facts.

*Cardinal Consulting Co. v. Circo Resorts, Inc.,* 297 N.W.2d 260, 266 (Minn. 1980) (quotation omitted). The fact that some damages have occurred must "be established to a reasonable certainty." *Imperial Developers, Inc. v. Seaboard Sur. Co.,* 518 N.W.2d 623, 626 (Minn. App. 1994), *review denied* (Minn. Aug. 24, 1994). "Uncertainty as to the fact of whether any damages were sustained at all is fatal to recovery. . . ." *Cardinal Consulting Co.,* 297 N.W.2d at 267 (quotation omitted). "Damages which are remote and

15

speculative cannot be recovered." *Jackson v. Reiling,* 311 Minn. 562, 563, 249 N.W.2d 896, 897 (1977).

The district court found that husband could have mitigated his damages by working as a machinist and farmer earning $17.75 per hour, which equals $36,920 per year, and that his damages for not being able to farm the leased land in 2013 would be equal to or less than $36,920 per year. Husband disputes the mitigation finding. Even if the evidence does not support that finding, the district court found that husband would have lost money by farming the leased land in 2013. Husband and wife's tax returns for years 2005 through 2011 showed an average annual loss of $6,443 per year. Based on those tax returns and the testimony of husband's accountant, the district court found that husband would not have made a profit farming the land in 2013.

Husband argues that the district court erred in relying on the income reported in his tax returns and should have credited the evidence he presented. But this court defers to the district court's determination of the weight and credibility of evidence. *Hasnudeen v. Onan Corp.*, 552 N.W.2d 555, 557 (Minn. 1996). Also, husband testified:

> Q. Do you remember in your deposition when I asked you historically how you would go about determining your past profits, losses, and net income that you told me that you would need to turn to your tax returns in order to be able to determine that, correct?
> A. I believe so.
> Q. And you said that your tax returns were the source of the information that would be accurate, correct, to determine that information?
> A. Yes.
> Q. And I guess what I'm getting at here, is just to confirm that you think that your tax returns are the indicator of how

> much profit, loss, net profit, income, expenses would be, correct? Yes or no.
>
> A. Yes.

Because the evidence supports the district court's finding that husband would not have made a profit farming the leased land in 2013, we affirm the zero damages award.

**Affirmed.**