**In re the Marriage of Tanya B. MILLER, petitioner, Respondent,**

v.

**Richard N. MILLER, Appellant.**

**No. C9-83-335.**

Supreme Court of Minnesota.

June 29, 1984.

Rehearing Denied Aug. 13, 1984.

---

*Id.*

Jack S. Jaycox, Bloomington, Jerrold F. Bergfalk, Stephen C. Davis, Minneapolis, for appellant.

Robert A. Hillstrom Bradley J. Martinson, Minneapolis, for respondent.

COYNE, Justice.

Richard Miller appeals from the amended judgment and decree of the Hennepin County District Court dividing the marital property and from the order denying his motion for a new trial. We affirm in part, reverse in part, and remand.

Richard and Tanya Miller were married on February 9, 1960, when Richard was 18 years old and Tanya was age 17. Neither

party owned any property at the time of their marriage, but during the course of their traditional marriage, they amassed holdings of very substantial value, all titled in Richard's name alone.

Richard is an entrepreneur who began his working career as a carpenter. Early in the marriage Richard started a part-time home remodeling business. In time his part-time enterprise expanded into single family home construction, residential subdivision development and construction, and Florida condominium development and construction. At the time of dissolution of the marriage, Richard operated a holding company as a sole proprietorship; he was the chief executive officer and sole shareholder of two development and construction corporations—one operating in Florida and the other in Minnesota;[1] Richard and his brother, as equal partners, owned a 44-unit apartment building in Edina; he owned a Florida motel and was engaged in the construction of a 42-unit condominium on the property; and he was the 51% owner of Mill Farms, one of Minnesota's largest turkey producers.

While Richard honed his entrepreneurial skills, Tanya was the homemaker and helpmate. At Richard's request Tanya did not seek employment outside the home. In addition, however, to her duties as wife and mother, she kept the books of the business and made out the payroll during the early years. In 1973 when the family moved into the manager's apartment in the Florida motel, Tanya did the bookwork and on occasion cleaned the motel rooms. Tanya helped set up the office and decorate the model units in the condominium complex Richard built on Sanibel Island, and she answered telephones and interviewed prospective purchasers. The trial court found that Tanya played a real and important part in the marital partnership.

Sometime in September of 1977 Richard moved out of the family home in Minnesota, but although Tanya instituted dissolution proceedings in 1978, the couple made several attempts at reconciliation. From time to time Richard stayed in the family home, Richard and Tanya travelled together, and they maintained the marital relationship until in the fall of 1979 reconciliation attempts were abandoned. On February 21, 1980, the Anoka County Court found an irretrievable breakdown and dissolved the Millers' marriage of 20 years. The court also declared that February 21, 1980, was the marital property valuation date but ordered a separate trial on the matter of the property division. By stipulation trial of the property division was venued in Hennepin County District Court.

The evidence adduced during 44 days of trial scattered over a period of 10 months and recorded in thousands of pages of transcript and the voluminous exhibits bear witness to the thoroughness with which the parties explored the question of the value of the marital property. In carefully crafted findings the district court valued each major asset separately and found that the net value of the total marital estate on February 21, 1980, was $14,654,618. The court determined that both Richard and Tanya had made substantial contributions to the development of the marital estate and divided the marital property in equal shares valued at $7,327,309. Specifically rejecting Richard's contention that the interdependence and commingling of his various business ventures precluded distribution of the marital property in kind, the court divided the property in kind, using what the court determined to be available cash to equalize the division.

■ Richard complains of the court's valuation of the marital property, of the equal division of the marital property, and of the distribution in kind—contending that the trial court did not make the just and equitable disposition of marital property required by Minn.Stat. § 518.58 (1980). We have frequently recognized that the trial court has broad discretion in dividing property upon dissolution of a marriage; and even though this court might have taken a somewhat different approach, we

1. Both corporations have elected subchapter S tax treatment.

will not overturn the trial court's decision absent a showing of clear abuse of that discretion. *E.g., O'Brien v. O'Brien,* 343 N.W.2d 850 (Minn.1984).

■ Although the trial court's valuation of the marital property was approximately 2.75 times the amount of Richard's valuation, the trial court's determination is, with the possible exception of the value of two units in Pointe Santo de Sanibel Condominiums, supported by the evidence. Moreover, the differences in the testimony concerning the dollar value of the marital estate are to a great extent neutralized by the manner in which the court divided the assets. For example, the major asset awarded to Tanya, 34 condominium units in Pointe Santo de Sanibel, represents about 40% of the total marital estate according to the trial court's valuation and 46% according to Richard's valuation. The three major assets awarded Richard—Timber Lakes, a residential subdivision development; Diamond Head, the motel and condominium project; and a 51% interest in Mill Farms, the turkey production operation—represent, in the aggregate, about 37% of the total marital estate according to the trial court's valuation and 35.5% according to Richard's.

■ Richard asserts that equal division of the marital property is unfair because the acquisition, preservation, and appreciation of the marital property is attributable only to *his* hard work, expertise, and business acumen and because an equal division does not take into account the tax consequences of the division. Although it is apparent that Richard possesses remarkable entrepreneurial skill, the trial court properly found that Tanya played a substantial part in amassing the marital estate. The skills directed to the acquisition and maintenance of the property is one factor which the court may consider, but it is not controlling. Section 518.58 allows

the court broad flexibility in the division of the marital estate. Furthermore, as we have previously observed, equal division of the wealth accumulated through the joint efforts of the parties is appropriate on dissolution of a long term marriage. *Arundel v. Arundel,* 281 N.W.2d 663 (Minn.1979).

We conclude that the trial court did not err in refusing to adjust the property division to reflect various potential tax consequences, including those tax consequences imposed in *United States v. Davis,* 370 U.S. 65, 82 S.Ct. 1190, 8 L.Ed.2d 335 (1962). The trial court expressed the opinion that there would be no *Davis* consequences.

In *Davis* the Supreme Court held that transfer to the wife of appreciated stock titled solely in the husband's name was a taxable event. Concluding that under Delaware law a wife's inchoate rights in her husband's property did not "even remotely reach the dignity of co-ownership," [2] the Court held that Davis' transfer of stock to his former wife was made in exchange for release of his independent legal obligations to her and was not, as Davis contended, a non-taxable division of property between co-owners.

The Minnesota dissolution statute in effect at the time of the Miller dissolution decree bears little resemblance to the fault statute construed in *Davis.* The Minnesota statutory direction for the disposition of marital property follows:

Upon dissolution of a marriage ... the court *shall make a just and equitable disposition of the marital property of the parties without regard to marital misconduct ....* The court shall base its findings on all relevant factors including the length of the marriage, any prior marriage of a party, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, needs, and opportu-

**2.** Delaware law at that time accorded the wife no interest over the management or disposition of her husband's personal property, her rights were not descendable, and provided that upon dissolution of the marriage for the husband's aggression the wife be restored to her real estate

and be allowed only such share in her husband's real and personal estate as the court deemed "reasonable." *United States v. Davis,* 370 U.S. 65, 70, 82 S.Ct. 1190, 1193, 8 L.Ed.2d 335 (1962).

nity for future acquisition of capital assets, the amount of support, maintenance and income of each party, whether the property awarded is in lieu of or in addition to maintenance or support. The court shall also consider the contribution of each in the acquisition, preservation, depreciation or appreciation in the amount or value of the marital property, as well as the contribution of a spouse as a homemaker. *It shall be presumed that each spouse made a substantial contribution to the acquisition of income and property* while they were living together as husband and wife. (Emphasis supplied).

Minn.Stat. § 518.58 (1980). (The presumption has since been made conclusive. 1982 Minn.Laws ch. 464, § 1.)

At the time the dissolution decree was entered here "marital property" was defined as

[P]roperty, real or personal ... acquired by the parties, or either of them, to a dissolution ... at anytime during the existence of the marriage relation between them.... *All property acquired by either spouse subsequent to the marriage and before a decree of legal separation is presumed to be marital property regardless of whether title is held individually or by the spouses in a form of co-ownership* .... (emphasis supplied).

Minn.Stat. § 518.54, subd. 5 (1980).

Effective March 19, 1982 (nine months before issuance of the property division order) the following language was added to § 518.54, subd. 5:

Each spouse shall be deemed to have a common ownership in marital property that vests not later than the time of the entry of the decree in a proceeding for dissolution .... The extent of the vested interest shall be determined and made final by the court pursuant to § 518.58.

1982 Minn.Laws, ch. 464, § 1, § 3. In the enabling provision the legislature acknowledged that the common ownership of marital property antedated the amendment:

The intent of the legislature in enacting this act is to confirm, clarify, and ratify legislative intent embodied in prior and existing state law, and state law as amended by this act, that the division or disposition of marital property caused by or incident to a decree of dissolution or annulment is not a sale, exchange, transfer, or disposition of or a dealing in property but is a division of a common ownership by spouses in property for purposes of the property laws of this state and for purposes of the United States and Minnesota income tax laws.

1982 Minn.Laws ch. 464, § 3. We, too, have observed that the added language was simply meant to confirm, clarify, and ratify the legislative intent already embodied in the definition of marital property: that divisions of marital property are *not* taxable events. *Janssen v. Janssen,* 331 N.W.2d 752, 755 n. 3 (Minn.1983).

The taxability under the Internal Revenue Code of any event is, of course, a matter of federal law. It is, however, for Minnesota to determine the nature and extent of the rights and interest in marital property of each spouse over whom Minnesota has jurisdiction and to characterize the court decreed partition of marital property as a division of common ownership rather than a sale or exchange. Minnesota recognizes that a nontitled spouse has a special ownership interest in marital property, which vests on commencement of the dissolution proceeding. Section 518.58 accords the nontitled spouse the *right* to a just and equitable division of the marital property and imposes on the court the *duty* to make such a division. Fault plays no part in the division, and the court must presume that the contribution of the homemaker spouse toward the acquisition of the marital property was substantial.

Other jurisdictions have recognized a special form of co-ownership in marital property which vests when a dissolution action is commenced. *Sanditen v. Sanditen,* 496 P.2d 365 (Okla.1972); *In Re Question Submitted by United States District Court,* 184 Colo. 1, 517 P.2d 1331 (1974); *Cady v. Cady,* 224 Kan. 339, 581 P.2d 358 (1978); *In Re Engle,* 293 Or. 207, 646 P.2d

20 (1982). This special form of co-ownership has been held sufficient to avoid federal income tax liability on the transfer of appreciated property to the nontitled spouse pursuant to a dissolution decree. *Imel v. United States*, 523 F.2d 853 (10th Cir.1975); *Collins v. Commissioner of Internal Revenue*, 412 F.2d 211 (10th Cir. 1969). We discern nothing in the special form of co-ownership recognized in Minnesota which would justify a different result.

Richard also challenges the trial court's failure to consider other potential tax liability precipitated by its property division. Although it is within the discretion of the trial court to consider the tax consequences of its property division, we have repeatedly stated that the court should not speculate about possible tax consequences. *O'Brien v. O'Brien*, 343 N.W.2d 850 (Minn. 1984); *Aaron v. Aaron*, 281 N.W.2d 150 (Minn.1979). The court must have sufficient information that the actual tax liability resulting from the property division can be calculated with a reasonable degree of certainty. Richard did not advise the court which property, if any, he must sell to satisfy the monetary award to Tanya, nor whether and to what extent he could shelter any gain realized from such a sale. We hold that the trial court's refusal to consider potential tax consequences did not constitute an abuse of discretion.

Richard also questions the propriety of the trial court's findings with respect to assets associated with an agreement dated January 2, 1978, for the exchange of like kind property pursuant to § 1031 of the Internal Revenue Code (1976). The agreement provided for the conveyance by one of Richard's wholly owned corporations to one Robert S. Zlobl of 20 units located in Pointe Santo de Sanibel Condominiums in exchange for Zlobl's conveyance of 50% of certain residential condominium units in Diamond Head Apartments to be selected by the parties. Under the terms of the agreement Zlobl was to construct the Diamond Head Apartments.[3] If the improvements were not completed by December 31, 1978, Zlobl was required to deposit $1,850,000 in escrow, subject to instructions intended to create an irrevocable grantor trust (IRC § 671 (1976)), to be held as security for Zlobl's performance of the exchange agreement. Apparently, Zlobl sold 18 of the 20 Pointe Santo de Sanibel Condominiums and deposited proceeds of $1,850,000 subject to the irrevocable grantor trust.

The trial court included in the value of the marital estate the sum of $1,850,000 (the amount held subject to the irrevocable trust) plus $216,800 (the advertised price of the two unsold units in Pointe Santo de Sanibel). In its division of the marital property the court treated the two unsold condominium units as marital property and included the $1,850,000 in "available cash," awarding Tanya the two condominium units and cash in the amount of $864,091. The court ordered Richard and Pointe Sanibel Development Corporation, a wholly owned corporation, to execute quit claim deeds to those units and to pay the cash sum forthwith.

Tanya contends the exchange transaction was a sham. The trial court, however, did not find that the transaction was fraudulent; and the evidence, both documentary and testimonial, indicates only that the transaction was structured with the intention of avoiding the recognition of gain through an exchange solely in kind pursuant to § 1031 of the Internal Revenue Code. Since, however, the two condominium units in question were part of the property subject to the exchange agreement and since Zlobl, to whom the condominium units were conveyed by the exchange agreement, is not a party to these proceedings, it is apparent that those two condominium units are not physical assets of the marital estate.

For the same reasons the $1,850,-000 which is held as security for Zlobl's

---

**3.** Miller and Zlobl were joint venturers pursuant to a January 2, 1978 contract for the construction and development of Diamond Head Apartments. Zlobl's interest in the joint venture was 50.25% and Miller's interest was 49.75%.

performance of his obligations under the exchange agreement, may not be characterized as "available cash." Albeit the funds are held in certificates of deposit, the cash is not "available" for division between Richard and Tanya; it is subject to the trust or escrow instructions, which direct payment to Zlobl for the cost of construction of Diamond Head Apartments.

This is not to say, however, that the value of the marital property should be reduced by $2,066,800 ($1,850,000 plus $216,800) or even by $216,800. It is simply to recognize that the form of asset held as marital property is neither two condominium units nor $1,850,000 in cash but rather the right to Zlobl's performance under the exchange agreement. Richard concedes that he will ultimately receive the benefit of the funds held as security—i.e., that the value of Zlobl's performance is at least $1,850,000. We are, however, unable to ascertain from the findings of fact whether or not the trial court's inclusion of the two unsold units in Pointe Santo de Sanibel Condominiums in the marital property reflects a determination that the value of the executory rights under the exchange agreement was greater than $1,850,000. Accordingly, we remand for determination of the value of the right to the conveyance, upon their construction, of 50% of certain residential condominium units in Diamond Head Apartments—either $1,850,000 or $2,066,800—and for the adjustment of the property division to the extent necessary to reflect the change, if any, in the value of the marital estate and to reflect the deletion from marital property of two units in Pointe Santo de Sanibel and the recharacterization of $1,850,000 in cash to the right to a conveyance pursuant to the exchange agreement. The trial court may also wish to reconsider, in the light of the reduced amount of cash available for division, the terms of any cash payment from one party to the other.

Affirmed in part, reversed in part, and remanded for further proceedings in conformity with this opinion.

TODD, J., took no part in the consideration or decision of this case.