*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-2206**

In re the Marriage of: Christina Marie Rexine, petitioner,
Appellant,

vs.

Joey Lee Rexine,
Respondent.

**Filed October 26, 2015
Affirmed
Hooten, Judge**

Hennepin County District Court
File No. 27-FA-13-2505

Erick G. Kaardal, James V.F. Dickey, Mohrman, Kaardal & Erickson, P.A., Minneapolis, Minnesota; and

Samantha J. Gemberling, Wolf, Rohr, Gemberling & Allen, P.A., St. Paul, Minnesota (for appellant)

Susan M. Gallagher, Gallagher Law Office, L.L.C., Eagan, Minnesota (for respondent)

Considered and decided by Halbrooks, Presiding Judge; Cleary, Chief Judge; and Hooten, Judge.

## U N P U B L I S H E D   O P I N I O N

**HOOTEN**, Judge

In this marital dissolution proceeding, appellant mother argues that the district court erred by: (1) awarding sole legal custody to respondent father; (2) declining to order

the parties to take their children to Catholic Mass on a weekly basis; (3) dividing marital property in an inequitable manner; and (4) ordering the parties to share their children's extracurricular activity costs according to their PICS percentages. We affirm.

**FACTS**

Appellant mother, Christina Marie Rexine (n/k/a Christina Marie Bulisco), and respondent father, Joey Lee Rexine, were married on July 14, 2001, and separated in April 2013. During their marriage, the parties had four children, all of whom who were minors at the time of the separation. In April 2013, Bulisco petitioned for dissolution of the parties' marriage. The district court held a dissolution trial on March 12–14, 2014. In June 2014, the district court issued findings of fact, conclusions of law, an order for judgment, and a judgment and decree. The same day, the district court also issued an order appointing a special master to consider the tax consequences of the forgiveness of certain marital debt and an order to reopen the record as to that issue.

In July 2014, Bulisco moved to amend the judgment and decree, challenging the district court's award of sole legal custody to Rexine, the district court's findings and conclusions regarding the children's religious upbringing, and certain financial and tax determinations. The district court held a hearing on the motion in September 2014. In December 2014, the district court issued an order partially granting and partially denying the motion, as well as an amended judgment and decree. This appeal by Bulisco followed.

## D E C I S I O N

## I.

Bulisco challenges the district court's decision to award Rexine sole legal custody of the children. The legal custodian of a minor child has "the right to determine the child's upbringing, including education, health care, and religious training." Minn. Stat. § 518.003, subd. 3(a) (2014). "Appellate review of custody determinations is limited to whether the district court abused its discretion by making findings unsupported by the evidence or by improperly applying the law." *In re Custody of N.A.K.*, 649 N.W.2d 166, 174 (Minn. 2002). A district court's findings of fact will be upheld unless they are clearly erroneous. *Pikula v. Pikula*, 374 N.W.2d 705, 710 (Minn. 1985).

In the amended judgment and decree, the district court awarded the parties joint physical custody of the four minor children and awarded Rexine sole legal custody. In support of its custody decision, the district court found that "both parties are good parents that love and desire the best for their children," but ultimately concluded that "the parties' inability to agree on anything relating to the children" and the "extraordinary animosity that plagues the parties' relationship necessitates an award of sole [legal] custody to one parent." The district court found that "evidence supports an award of sole legal custody to [Rexine]" because the record showed that Bulisco would use sole legal custody to "continue to control [Rexine's] parenting time to the degree that would alienate [Rexine] from his children."

Bulisco argues that, because the parties contemplated joint legal custody, the district court improperly applied the law by declining to analyze the joint-custody factors

under Minn. Stat. § 518.17, subd. 2(b) (2014).[1] Section 518.17, subdivision 2(b), requires that, "where either joint legal or joint physical custody is contemplated or sought," the district court must make its custody determination in light of the following factors:

1. the ability of parents to cooperate in the rearing of their children;
2. methods for resolving disputes regarding any major decision concerning the life of the child, and the parents' willingness to use those methods;
3. whether it would be detrimental to the child if one parent were to have sole authority over the child's upbringing; and
4. whether domestic abuse, as defined in [Minn. Stat. § 518B.01 (2014)], has occurred between the parents.

The statute also establishes "a rebuttable presumption that upon request of either or both parties, joint legal custody is in the best interests of the child." *Id.* In its amended judgment and decree, the district court stated that it would not specifically analyze the factors under section 518.17, subdivision 2(b), because "neither party is seeking joint legal or joint physical custody of the minor children."

---

[1] We note that section 518.17, subdivision 2, was recently repealed and its content partially incorporated into the revised subdivision 1 of that section. *See* 2015 Minn. Laws ch. 30, art. 1, § 3 (amending Minn. Stat. § 518.17, subd. 1 (2014)); *id.*, ch. 30, art. 1, § 13 (repealing Minn. Stat. § 518.17, subd. 2)). Because this was a substantive change to the statute and the legislature did not indicate that the revisions apply retroactively, the 2014 version of subdivision 2 applies to this case. *See Interstate Power Co. v. Nobles Cty. Bd. of Comm'rs*, 617 N.W.2d 566, 575 (Minn. 2000) (citation omitted) ("The general rule is that appellate courts apply the law as it exists at the time they rule on a case, even if the law has changed since a lower court ruled on the case. An exception to this rule exists when rights affected by the amended law were vested before the change in the law.").

Bulisco points out that, at the beginning of the proceedings, Rexine had requested joint legal and joint physical custody. However, as the custody evaluation progressed, Rexine changed his request in light of the escalating conflict between the parties. At trial, Rexine requested sole legal and sole physical custody, but with an even split of parenting time between the parties. Bulisco argues that even if neither party was seeking joint legal custody by the time of trial, Minn. Stat. § 518.17, subd. 2, requires the district court to analyze the joint-custody factors if either party *ever* sought joint custody. In the alternative, Bulisco argues that because the district court awarded joint physical custody, the district court was required to analyze the joint-custody factors.

Statutory interpretation is a question of law that we review de novo. *Swanson v. Swanson*, 856 N.W.2d 705, 709 (Minn. App. 2014). If the language of a statute is unambiguous on its face, "our role is to enforce the language of the statute and not explore the spirit or purpose of the law." *Sanvik v. Sanvik*, 850 N.W.2d 732, 735 (Minn. App. 2014) (quotation omitted). One of the situations requiring the district court to analyze the joint-custody factors is when "joint physical custody is contemplated." Minn. Stat. § 518.17, subd. 2(b). Although neither party requested joint physical custody at the time of trial, the district court clearly "contemplated" joint physical custody by awarding joint physical custody. The statute does not specify that joint custody must be "contemplated or sought" *by the parties*. Rather, the statute requires the district court to analyze the joint-custody factors if either the parties or the district court contemplates joint legal or joint physical custody. *See id.*

In expressly declining to amend its findings to include analysis of the joint-custody factors, the district court pointed out that if it were required to analyze the joint-custody factors every time it awarded joint physical custody, then "the [c]ourt would always be required to analyze subd. 2 despite the parties' request." But, this is exactly how we have previously interpreted Minn. Stat. § 518.17, subd. 2(b):

> When a district court awards joint legal or physical custody over the objection of one parent, the court must make detailed findings on each of the statutory joint-custody factors and explain how the factors led to the court's determination that joint custody would be in the best interests of the child.

*Zander v. Zander*, 720 N.W.2d 360, 366 (Minn. App. 2006), *review denied* (Minn. Nov. 14, 2006). Here, the district court erred in its legal conclusion that it was not required to address the subdivision 2(b) joint-custody factors.

However, this error was harmless because the district court's detailed and extensive findings pertain directly to the joint-custody factors. *See* Minn. R. Civ. P. 61 (requiring harmless error to be ignored). In its thorough and thoughtful analysis of the difficult issues in this custody dispute, the district court made very extensive findings regarding the involvement of both parents in the children's lives and the importance of awarding joint physical custody in order to allow the children's relationships with both parents to continue to thrive. Relying upon the custody evaluator's testimony and report, which specially addressed the subdivision 2(b) factors, the district court found that the parties were not able to cooperate in rearing their children, effectively resolve their disputes, or agree even on such common issues as the selection of a parenting coordinator. The district court also noted its concern with Bulisco's history of interfering

6

with Rexine's parenting time and relationship with their children, and the likely negative effect on the children's relationship with Rexine if Bulisco had sole legal custody of the children. The district court also found, consistent with the testimony of the custody evaluator, that even though the parties could not "effectively co-parent in a joint legal custody arrangement," it was in the best interests of the children that the parties have joint physical custody because the children needed "both parents equally present in their lives." Finally, the district court found that there was no domestic abuse in this case. Although the district court erred in its legal conclusion that it was not required to address the subdivision 2(b) factors, this erroneous conclusion was harmless in light of the district court's extensive findings fully addressing those factors. Based upon the record and these findings, we conclude that the district court did not abuse its discretion by awarding the parties joint physical custody and sole legal custody to Rexine.

Bulisco also argues that the district court abused its discretion by finding that it was in the children's best interest for Rexine to have sole legal custody because Bulisco is "undoubtedly more likely to continue educating and raising the children in their culture and religion." The record does not support Bulisco's assertion; Rexine testified that, consistent with the children's religious training during the marriage, it was his intent to continue raising the children in the Catholic faith. The district court did not abuse its discretion in awarding sole legal custody to Rexine in light of the parties' high-conflict relationship, their inability to resolve their disputes, and Bulisco's continuing effort to undermine and restrict Rexine's parenting time and relationship with the children.

7

## II.

Bulisco argues that the district court abused its discretion by declining to order that the children attend Catholic Mass weekly. She argues that the district court should have upheld the parties' agreement to raise their children in the Catholic faith by directing the parties to require the children to attend a specific schedule of religious events, including attendance at weekly Mass. In support of this argument, Bulisco cites extensively to "Catholic doctrine as set forth in Canon Law and the Catechism" and asserts that noncompliance with such doctrine would cause the children to "risk grave sin."

The record shows that the parties at some point verbally agreed to raise their children as Catholics, but their agreement was unspecific as to what that meant. The district court found that during the marriage Rexine actually took the children to Mass more often than Bulisco, and this finding is supported by Bulisco's testimony that she sometimes stayed home from Mass to work. Bulisco testified that, after the parties separated, Rexine failed to take the children to Mass "consistently." But, Rexine contradicted this assertion, explaining that because of Bulisco and her parents' harassing behavior during Mass, he began taking the children to Mass at times when he knew that they would not be there. The district court found Rexine's testimony to be "credible and consistent."

In the amended judgment and decree, the district court found "that the children shall continue to be raised in the Catholic faith" and ordered the parties to "continue to

8

support the minor children in their Catholic faith." The district court also provided that "the parties, along with the minor children on their scheduled parenting time, may attend any church of their choosing and whichever Mass time," and ordered that if the parties attend the same Mass time, "the off-duty parent shall not harass [or] interfere with the other [parent's] parenting time." In its order on Bulisco's motion to amend the judgment and decree, the district court denied Bulisco's request to be designated as "sole legal custodian as to religious upbringing of the minor children." Instead, the district court found that "the evidence supports that it should be [left] to the discretion of the parent with parenting time to determine whether the children should attend [M]ass or any other holy days of obligation."

Rexine was awarded sole legal custody, which, by statute, means that he has the sole authority to determine the children's "religious training." Minn. Stat. § 518.003, subd. 3(a). If the district court had ordered the parties to ensure that the minor children attend Catholic Mass weekly, the district court would have infringed on Rexine's rights as sole legal custodian by placing a limitation on his ability to determine the children's religious training.[2] Based upon this record, where there was evidence that Bulisco and her family were using the children's attendance at Mass as an opportunity to interfere

---

[2] We note that the district court, by ordering the parties to "continue to support the minor children in their Catholic faith," nonetheless appears to have already limited Rexine's rights as sole legal custodian of the minor children because Rexine does not have full authority over the children's "religious training." Minn. Stat. § 518.003, subd. 3(a). According to these limiting provisions in the amended judgment and decree, Rexine is prevented from raising the children in a religion other than Catholicism, or from raising the children with no religion at all. Rexine, however, did not file a notice of related appeal and does not contest this judicially imposed limitation of his authority as the sole legal custodian.

9

with Rexine's parenting time, the district court did not abuse its discretion by declining to limit, or infringe upon, Rexine's statutory rights as the sole legal custodian by ordering that the children attend Catholic Mass weekly.

**III.**

Bulisco alleges two errors in the district court's division of the marital estate. "District courts have broad discretion over the division of marital property and appellate courts will not alter a district court's property division absent a clear abuse of discretion or an erroneous application of the law." *Sirek v. Sirek*, 693 N.W.2d 896, 898 (Minn. App. 2005). When dividing property, a district court abuses its discretion if it resolves the matter in a manner "that is against logic and the facts on record." *Rutten v. Rutten*, 347 N.W.2d 47, 50 (Minn. 1984). "This court will affirm the district court's division of property if it had an acceptable basis in fact and principle even though this court might have taken a different approach." *Passolt v. Passolt*, 804 N.W.2d 18, 25 (Minn. App. 2011) (quotation omitted), *review denied* (Minn. Nov. 15, 2011).

***Student loan debt***

Bulisco first argues that the district court abused its discretion by awarding all of the parties' student loan debt to Rexine and ordering Bulisco to make an equalizer payment. The district court found that an equal division of the marital estate was equitable here. To that end, the district court allocated the entire amount of the parties' student loan debt to Rexine and required Bulisco to make an equalizer payment to Rexine in order to make up for the uneven allocation of the debt. If Bulisco failed to pay the equalizer within 90 days of the judgment and decree, then the marital homestead would

10

be subject to a lien in Rexine's favor in the amount of the equalizer payment. Bulisco did not pay the equalizer within 90 days, so the district court entered a summary real estate disposition judgment, imposing a lien in Rexine's favor in the amount of the equalizer payment.

In Bulisco's motion to amend the judgment and decree, she asked the district court to find that she had "no ability to pay a large cash equalizer" and that she was awarded no assets that she could liquidate to pay the equalizer, except for the homestead. She also requested that the district court reassign the larger of the two student loans to her in the division of property. The district court declined to do so.

Bulisco argues on appeal that the uneven distribution of student loans and the imposition of the equalizer payment were unfair because she had no ability to pay the equalizer without selling the homestead. But, the record supports the district court's finding that Bulisco had adequate resources to pay the equalizer. As the district court pointed out, the equity in the home awarded to Bulisco was approximately $120,000, which is "about the amount of the cash equalizer"; Bulisco is a physician and earned $439,014 gross income in 2013; and Bulisco was awarded other valuable property in the division of the estate, including a retirement asset worth approximately $60,000. The record does not support Bulisco's claim that she would have to sell the homestead to pay the equalizer.

The district court's decision to allocate the entire amount of the student loans to Rexine also had a reasonable basis in fact and principle. The district court found that Rexine should be responsible for the entire amount of the student loans because he bore

the entire financial risk for the student loans. Rexine testified that the loans were solely in his name, and Bulisco did not provide any evidence to the contrary. Moreover, in the order on Bulisco's motion to amend, the district court explained that it was "inclined to assign all the debt to one party in situations where the parties are unable to effectively communicate" because "a clear separation of financial obligations will help lessen the need to communicate." Because the district court's decision was not against logic or the facts in the record, we conclude that the district court did not abuse its discretion by assigning the student loans to Rexine and requiring Bulisco to pay a corresponding equalizer.

*Promissory notes*

Bulisco also challenges the district court's decision that the parties should share the tax consequences of four promissory notes that Rexine incurred in connection with his medical school fellowship. Rexine incurred the promissory notes during the marriage, and the stipends were used for marital expenses. The promissory notes were advances on Rexine's future payments from his employer, and the notes' terms stated that the loans would be forgiven if Rexine remained employed with that employer through certain dates. The district court concluded that, because the benefits of these promissory notes were shared by both parties, both parties should share in the tax consequences of forgiveness of the promissory notes. However, at trial, the district court lacked sufficient evidence to make an informed decision as to the division of the tax consequences because there was no evidence in the record regarding the fourth promissory note. Therefore, the district court retained jurisdiction over the matter, reopened the record to receive

12

supplemental evidence on the fourth promissory note, and appointed a special master to decide how the tax consequences should be divided between the parties.

A district court may consider future tax consequences when dividing marital property in a marital dissolution if the district court has a reasonable and supportable basis for making an informed judgment as to the probable liability. *Maurer v. Maurer*, 623 N.W.2d 604, 607–08 (Minn. 2001). The district court may not assign liability for tax consequences based on "generally insufficient evidence." *Id.* at 607. "The court must have sufficient information that the actual tax liability resulting from the property division can be calculated with a reasonable degree of certainty." *Miller v. Miller*, 352 N.W.2d 738, 744 (Minn. 1984). This court reviews the district court's decisions as to the division of tax consequences for an abuse of discretion. *Maurer*, 623 N.W.2d at 607.

Bulisco argues that the district court impermissibly speculated as to tax consequences by finding that both parties benefitted from the promissory notes and should therefore be responsible for the tax consequences. But, the record supports this finding. Rexine testified that the majority of the proceeds from the loans were disbursed during the parties' marriage and that both parties used these loan proceeds for marital living expenses. Moreover, Bulisco failed to produce any evidence refuting Rexine's claim that that they both benefitted from the funds provided during the marriage as a result of the promissory notes.

Bulisco also tries to characterize the district court's actions of appointing a special master and its failure to conduct its own inquiry into the tax consequences as impermissible speculation based upon insufficient evidence. However, both parties

consented to the appointment of the special master.  Additionally, the alleged errors that Bulisco raises were intentional actions by the district court to *avoid* speculating upon insufficient evidence.  *See Miller*, 352 N.W.2d at 744 (stating that the district court "should not speculate about [the] possible tax consequences" of its property division).  The district court declined to determine the proportional liability for the tax consequences precisely because it recognized that there was insufficient evidence before it to make such a determination.  Instead, the district court left it to the special master to make an inquiry into the terms of the notes and to determine, based upon sufficient evidence, how the tax consequences should be divided.

The district court did not abuse its discretion by determining that the parties should share the tax consequences of the promissory notes and appointing a special master to determine those tax consequences based upon a complete record as to the promissory notes.

## IV.

Bulisco argues that the district court abused its discretion by requiring the parties to split the children's extracurricular activity costs according to their parental income for determining child support (PICS) percentages.  "We will reverse a district court's child-support order only if we are convinced that the district court abused its broad discretion by reaching a clearly erroneous conclusion that is against logic and the facts on record." *Hunley v. Hunley*, 757 N.W.2d 898, 900 (Minn. App. 2008) (quotation omitted).

The district court calculated the parties' basic child support obligations based on the parties' respective PICS percentages.  After the judgment and decree addressed basic

14

support, it designated responsibility for "other support-related expenses," including costs incurred for the children's extracurricular activities. The district court ordered the parties to pay such costs in proportion to their PICS percentages.

Bulisco argues that the district court abused its discretion in its division of responsibility for the costs of extracurricular activities because Rexine could potentially "select any activity, regardless of the input of Bulisco, and regardless of the cost." Bulisco alleges that this could result in "a *de facto* reduction of Bulisco's parenting time" because Rexine could choose only activities that occurred during Bulisco's parenting time, and that this could allow Rexine to "increase his support payment by signing the children up for the most expensive activities." The record does not support Bulisco's allegations; rather, the record indicates that Rexine is far less inclined than Bulisco to schedule extracurricular activities for the children. Bulisco's unsubstantiated fears that Rexine would abuse the child support arrangement do not support the conclusion that the district court abused its discretion in its division of the children's extracurricular activity costs.

Bulisco does not present any other argument as to why it was an abuse of discretion to divide extracurricular costs according to the parties' PICS percentages. Such an approach is logical and supported by the facts in the record regarding the parties' respective ability to pay for extracurricular activities.

**Affirmed.**

15